REVISED, September 8, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-10178

_____

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,

v.

ORLANDO CORDIA HALL, also known as Lan,

                    Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

August 21, 1998

Before KING, SMITH, and STEWART, Circuit Judges.

KING, Circuit Judge:

    Defendant-Appellant Orlando Cordia Hall challenges his

conviction and sentence for kidnapping resulting in death,

conspiring to kidnap, traveling in interstate commerce to promote

possession of marijuana with intent to distribute, and using and

carrying a firearm during a crime of violence.  For the reasons

set forth below, we affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

    Orlando Cordia Hall, along with Bruce Webster and Marvin

Holloway, ran a marijuana trafficking enterprise in Pine Bluff,

Arkansas.  They purchased marijuana in varying amounts in the

1

Dallas/Fort Worth area with the assistance of Steven Beckley, who lived in Irving, Texas. The marijuana was transported, typically by Beckley, to Arkansas and stored in Holloway's house.

On September 21, 1994, Holloway drove Hall from Pine Bluff to the airport in Little Rock, Arkansas, and Hall took a flight to Dallas, Texas to engage in a drug transaction. Beckley and Hall's brother, Demetrius Hall (D. Hall), picked Hall up at the airport. Later that day, Hall and Beckley met two local drug dealers, Stanfield Vitalis and Neil Rene (N. Rene), at a car wash and gave them $4700 for the purchase of marijuana. Later that day, Beckley and D. Hall returned to the car wash to pick up the marijuana, but Vitalis and N. Rene never appeared. Later, when Hall got in touch with Vitalis and N. Rene by telephone, they claimed that they had been robbed of the $4700. Using the telephone number that Beckley had used to contact Vitalis and N. Rene, Hall procured an address at the Polo Run Apartments in Arlington, Texas from a friend who worked for the telephone company. Hall, D. Hall, and Beckley began conducting surveillance at the address and saw Vitalis and N. Rene exit an apartment and approach the same car that they had driven to the car wash, which they claimed was stolen from them along with Hall's $4700. Hall therefore deduced that Vitalis and N. Rene had lied to him about being robbed.

On September 24, 1994, Hall contacted Holloway and had him drive Webster to the Little Rock Airport. From there, Webster flew to Dallas. That evening, Hall, D. Hall, Beckley, and

2

Webster returned to the Polo Run Apartments in a Cadillac Eldorado owned by Cassandra Ross, Hall's sister. Hall and Webster were each armed with handguns, D. Hall carried a small souvenir baseball bat, and Beckley had duct tape and a jug of gasoline. The four men approached the apartment that they had previously seen Vitalis and N. Rene leave.

Webster and D. Hall went to the front door of the apartment and knocked. The occupant of the apartment, Lisa Rene, N. Rene's sixteen-year-old sister, refused to let them in and called her sister and 911. After Webster unsuccessfully attempted to kick in the door, he and D. Hall went around to a sliding glass door on the patio and saw that Lisa Rene was on the telephone. D. Hall shattered the glass door with his baseball bat, Webster entered the apartment, tackled Lisa Rene, and dragged her to the car. Hall and Beckley had returned to the car when they heard the sound of breaking glass. Webster forced Lisa Rene onto the floorboard of the car, and the group drove to Ross's apartment in Irving, Texas. Once there, they exited the Cadillac and forced Lisa Rene into the backseat of Beckley's car. Hall got in the backseat as well. Beckley got in the driver's seat, and Webster got in the front passenger seat. The group then drove off again. During the drive, Hall raped Lisa Rene and forced her to perform oral sex on him. The group later returned to Ross's apartment.

From there, Beckley, D. Hall, and Webster drove Lisa Rene to Pine Bluff. Hall remained in Irving and flew back to Arkansas the next day. Once Beckley, D. Hall, and Webster reached Pine

Bluff, they obtained money from Holloway to get a motel room.  In the motel room, they tied Lisa Rene to a chair and raped her repeatedly.

Hall and Holloway arrived at the motel room on Sunday morning, September 25, 1994.  They went into the bathroom with Lisa Rene for approximately fifteen to twenty minutes.  When Hall and Holloway came out of the bathroom, Hall told Beckley, "She know too much."  Hall, Holloway, and Webster then left the motel.

Later that afternoon, Hall and Webster went to Byrd Lake Park and dug a grave.  That same evening, Hall, Webster, and Beckley took Lisa Rene to Byrd Lake Park, but could not find the grave site in the dark.  They then returned to the motel room.  In the early morning of Monday, September 26, 1994, Beckley and D. Hall moved Lisa Rene to another motel because they believed that the security guard at the first motel was growing suspicious.

Later the same morning, Webster, Hall, and Beckley again drove Lisa Rene to Byrd Lake Park.  Lisa Rene's eyes were covered by a mask.  Hall and Webster led the way to the grave site, with Beckley guiding Lisa Rene by the shoulders.  At the grave site, Hall turned Lisa Rene's back toward the grave and placed a sheet over her head.  He then hit her in the head with a shovel.  Lisa Rene screamed and started running.  Beckley grabbed her, and they both fell down.  Beckley then hit Lisa Rene in the head twice with the shovel and handed it to Hall.  Webster and Hall then began taking turns hitting her with the shovel.  Webster then

4

gagged Lisa Rene and dragged her into the grave.  He covered her with gasoline and shoveled dirt back into the grave.  Hall, Beckley, and Webster then returned to the motel and picked up D. Hall.

On September 29, 1994, an arrest warrant issued out of the City of Arlington for Hall, D. Hall, and Beckley for Lisa Rene's kidnapping.  D. Hall, Beckley, and Webster were subsequently arrested.  On September 30, 1994, Hall surrendered to Pine Bluff authorities in the presence of his attorney.  On the advice of counsel, he did not give a statement at the time of his arrest, but indicated that he would talk with law enforcement agents after he was transported to Texas.  On October 5, 1994, following his transfer to the Arlington County jail, Hall gave a written statement to FBI and Arlington County officials in which he substantially implicated himself in the kidnapping and murder.

On October 26, 1994, the United States District Court for the Northern District of Texas issued a criminal complaint charging Hall, D. Hall, Webster, and Beckley with kidnapping in violation of 18 U.S.C. § 1201(a)(1).  On November 4, 1994, a six-count superseding indictment was returned, charging Hall, D. Hall, Webster, Beckley, and Holloway with kidnapping in which a death occurred in violation of 18 U.S.C. § 1201(a)(1) (count 1), conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) (count 2), traveling in interstate commerce with intent to promote the possession of marijuana with intent to distribute in violation of 18 U.S.C. § 1952 (count 3), using a telephone to

5

promote the unlawful activity of extortion in violation of 18 U.S.C. § 1952 (count 4), traveling in interstate commerce with intent to promote extortion in violation of 18 U.S.C. § 1952 (count 5), and using and carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) (count 6).  On February 23, 1995, the government filed its notice of intent to seek the death penalty against Hall pursuant to the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. §§ 3591-3598.  On April 6, 1995, the district court granted Hall's motion to sever his trial from that of his codefendants, and trial commenced on October 2, 1995.

The jury returned a verdict of guilty as to counts 1, 2, 3, and 6.  After the penalty phase of the trial, the jury returned a recommendation that a sentence of death be imposed.  The district court sentenced Hall to death on count 1, life imprisonment on count 2, sixty months imprisonment on count 3 to run concurrently with the life sentence imposed on count 2, and sixty months imprisonment on count 6 to run consecutively to the sentences imposed on counts 2 and 3.  Hall filed a timely notice of appeal.

## II.  DISCUSSION

Hall appeals his judgment of conviction and sentence on the following grounds:

1.  The district court's failure to allow Hall to allocute before the jury violated his right to due process, violated Rule 32 of the Federal Rules of Civil Procedure, and was an abuse of discretion

6

under the evidentiary standards governing the penalty phase of a capital trial under the FDPA.

2. The district court violated Hall's Fifth and Eighth Amendment rights by conditioning the admission of psychiatric testimony in mitigation of punishment upon Hall's submission to a government psychiatric examination prior to conviction without restricting the government's access to the results of the examination until after the guilt phase of trial.

3. The district court abused its discretion by admitting certain materials and testimony into evidence because they were unfairly prejudicial.

4. The admission of evidence regarding unadjudicated offenses during the penalty phase and a lack of a jury instruction requiring the jury to apply some burden of proof to this evidence rendered the death sentence unreliable.

5. The admission of nontestimonial victim impact statements during the penalty phase violated Hall's Sixth Amendment right of confrontation, due process, and the FDPA's evidentiary standards.

6. The district court's rejection of defense challenges for cause to impaired and biased venirepersons denied Hall due process, an impartial jury, and his statutory right to free

7

exercise of peremptory challenges.

7.   The jury's failure to consider the circumstances
     surrounding Hall's upbringing as a mitigating
     factor was clearly erroneous and requires vacation
     of his death sentence.

8.   Several of the aggravating factors submitted to
     the jury were unconstitutionally vague, overbroad,
     and duplicative.

9.   The district court's denial of Hall's motions for
     continuance denied Hall his rights to due process
     and effective assistance of counsel under the
     Fifth and Sixth Amendments.

10.  The district court erred in denying Hall's request
     to poll the jury regarding a news report and
     debate that aired during penalty-phase
     deliberations.

11.  The district court erred in denying Hall's motion
     to suppress his oral and written statements as
     violative of his Fifth and Sixth Amendment rights
     as well as applicable federal statutes and rules.

We address each of these issues in turn.

## A.   Allocution

Hall first contends that the district court's denial of his request to make an unsworn statement of remorse to the jury during the penalty phase of his trial constitutes reversible

error.[1]  In this regard, Hall advances a number of arguments.
First, he contends that Rule 32(c)(3)(C) of the Federal Rules of
Criminal Procedure afforded him a right to allocute before the
jury.  Second, he claims that, even if Rule 32(c)(3)(C) does not
specifically create a right to allocute before the jury, such a
right was recognized at common law, and the FDPA does not clearly
abrogate this right.  Third, he contends that he possesses a
constitutional right to allocute.  Fourth, he claims that, even
if no constitutional right to allocute exists per se, the
district court's refusal to allow him to allocute in this case
nonetheless violated his due process-based right to procedural
parity because the district court unfairly allowed the government
to present victim impact statements that were not subject to
cross-examination.  Fifth, he argues that the district court's
refusal to allow him to make an unsworn statement of remorse
before the jury constituted an abuse of discretion under the
FDPA's evidentiary standards.  We address each of these arguments
in turn.

---

[1]  Hall's proffered statement in allocution was as follows:

I want to apologize to my family and ask them to
forgive me, and I hope somehow they can forgive me.  I
want to apologize to Lisa Rene's family and ask them to
forgive me, even though I know that there is no
possible way they can forgive me and I understand that.
I want to ask God to forgive me, however, I question in
my own mind whether even God can forgive me.

## 1. Statutory Right of Allocution

Hall contends that Rule 32(c)(3)(C) of the Federal Rules of Criminal Procedure afforded him the right to make an unsworn statement of remorse before the jury. Rule 32(c)(3)(C) provides that, "[b]efore imposing sentence, the court must . . . address the defendant personally and determine whether the defendant wishes to make a statement and to present any information in mitigation of the sentence." FED. R. CRIM. P. 32(c)(3)(C).

In support of his contention that Rule 32(c)(3)(C) creates a right to make an unsworn statement before the jury in capital cases, Hall relies upon the following language from 18 U.S.C. § 3593(c), which establishes the procedures for sentencing hearings in capital cases:

> Notwithstanding rule 32(c) of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads guilty to an offense under section 3591, no presentence report shall be prepared. At the sentencing hearing, information may be presented as to any matter relevant to the sentence . . . .

18 U.S.C. § 3593(c). Hall argues that, because the statute expressly states that the portion of Rule 32 requiring the preparation of a presentence report is inapplicable in capital cases and makes no similar reference to any other portion of Rule 32, the doctrine of expressio unius exclusio alterius indicates that Congress did not intend for the FDPA to displace other provisions of Rule 32, including the right to allocute created by subsection (c)(3)(C).[2]

---

[2] In order to avoid confusion, it should be noted that the FDPA was enacted in an omnibus crime control act that also

10

We need not decide whether § 3593 was intended to displace Rule 32(c)(3)(C) because we conclude that, regardless of whether it was required to do so, the district court complied with the plain language of Rule 32(c)(3)(C) by inquiring of Hall whether he wished to make a statement before it announced his sentence. The text of the rule provides no basis for concluding that the defendant has a right to make a statement to the jury prior to the jury's arriving at its sentencing recommendation. Compliance with the strict language of the rule is achieved when, as was the case here, the district court allows the defendant to make a statement to the court after the jury returns its recommendation but before the district court imposes sentence.[3]

Hall responds that this interpretation of Rule 32(c)(3)(C) would render allocution an empty gesture because the district court has no discretion to disregard the jury's recommendation. However, other circumstances exist in which allocution is equally devoid of practical impact. This is the case when the statutory

included another act which amended Rule 32. See Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, tits. VI, XXIII, secs. 60002(a), 230101(b), 108 Stat. 1796, 1959-68, 2078. The Rule 32 amendment moved allocution from subsection (a) to subsection (c) of Rule 32 and moved the requirement of preparing a presentence report from subsection (c) to subsection (b). It therefore appears that the phrase "[n]otwithstanding rule 32(c) of the Federal Rules of Criminal Procedure" in § 3593(c) refers to subsection (c) of the prior version of Rule 32 and subsection (b) of the current version of the rule.

[3] While the record does not contain a transcript of the hearing at which the district court imposed sentence, the government represented at oral argument that, at this hearing, the district court asked Hall if he wished to make a statement before the imposition of sentence. In any event, even if this did not occur, Hall does not complain about it on appeal.

11

mandatory minimum sentence for a particular offense exceeds the maximum sentence under the otherwise applicable U.S. Sentencing Guidelines range. In that circumstance, "the court is required to impose the statutory minimum sentence." Santana v. United States, 98 F.3d 752, 756 (3d Cir. 1996); see also U.S. SENTENCING GUIDELINES MANUAL § 5G1.1(b) ("Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutory minimum sentence shall be the guideline sentence.").[4]

Furthermore, § 3593(c) counsels against construing Rule 32(c)(3)(C) as establishing an unconditional right for the defendant to make an unsworn statement of remorse to the jury. Section 3593(c) sets forth with great specificity the type of information that may be submitted to the jury during the penalty phase of a capital trial and the circumstances under which it may be presented.[5] In this regard, the statute provides as follows:

> At the sentencing hearing, information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3592. Information presented may include the trial transcript and exhibits if the hearing is held before a jury or judge not present during the trial, or at the trial judge's discretion. The defendant may present any

---

[4] This is true unless the government files a motion authorizing the court "to impose a sentence below a level established by statute as minimum sentence so as to reflect a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense." 18 U.S.C. § 3553(e).

[5] Hall concedes that his "proffered allocution constituted information relevant to the mitigating factors of remorse and acceptance of responsibility."

12

> information relevant to a mitigating factor.  The
> government may present any information relevant to an
> aggravating factor for which notice has been provided .
> . . .   Information is admissible regardless of its
> admissibility under the rules governing admission of
> evidence at criminal trials <u>except that information may
> be excluded if its probative value is outweighed by the
> danger of creating unfair prejudice, confusing the
> issues, or misleading the jury</u>.

18 U.S.C. § 3593(c) (emphasis added).  Construing Rule 32(c)(3)(C) as granting a defendant the unconditional right to make an unsworn statement of remorse to the jury would contravene § 3593's mandate that the district court exercise discretion in determining whether to exclude any information offered by the parties on the basis that its probative value "is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  <u>Id.</u>  Section 3593(c) does not contemplate exempting any type of information offered at a sentencing hearing from the district court's gatekeeping function, and we decline to interpret Rule 32(c)(3)(C) to have this effect when the plain language of the rule does not dictate such an interpretation.

Furthermore, both Hall and the government concede that § 3593 authorized Hall to make a sworn statement of remorse that would have been subject to cross-examination.[6]  Construing Rule 32(c)(3)(C) as creating a per se right to make an unsworn statement of remorse to the jury that is not subject to cross-

---

[6]  As indicated in Part II.A.5, <u>infra</u>, in connection with Hall's argument that the district court abused its discretion in declining to allow him to make an unsworn statement to the jury, we express no opinion as to whether the district court could properly exercise its discretion to allow a defendant to make such a statement.

13

examination would in no sense increase the accuracy and reliability of the capital-sentencing process. When the district court receives a statement in allocution, it recognizes the legal effect of the fact that the statements are not sworn and the attendant potential effect of this fact upon the credibility of the defendant's statements; the same cannot be said for a jury. Cf. State v. Williams, 688 So. 2d 1277, 1284 (La. Ct. App. 1997) ("The right of allocution has normally been reserved to a defendant addressing the sentencing judge."); Commonwealth v. Abu-Jamal, 555 A.2d 846, 858 (Pa. 1989) ("We find no reason in law or logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from testing for truthfulness and reliability that is accomplished by cross-examination."). We therefore conclude that the district court did not violate Rule 32(c)(3)(C) by denying Hall's request to make an unsworn statement of remorse before the jury.

## 2. Common-Law Right of Allocution

Hall next contends that, even if Rule 32(c)(3)(C) does not expressly provide him with a per se right to make an unsworn statement of remorse before the jury, he possesses a common-law right to do so. He further argues that we should not construe § 3593 as abrogating this common-law right because "[i]t is a well-established principle of statutory construction that '[t]he common law . . . ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this

14

purpose.'" <u>Norfolk Redev. & Housing Auth. v. Chesapeake & Potomac Tel. Co.</u>, 464 U.S. 30, 35 (1983) (quoting <u>Fairfax's Devisee v. Hunter's Lessee</u>, 11 U.S. (7 Cranch) 603, 623 (1813) (second set of brackets and ellipses in original)).  We conclude, however, that no such common-law right exists.

At common law, a felony defendant had a right to have the court formally inquire "'what he had to say why judgment should not be given against him.'"  Paul W. Barrett, <u>Allocution</u>, 9 Mo. L. Rev. 121 (1944) (quoting <u>Rex & Regina v. Geary</u>, 2 Salk. 630 (K.B. 1689-1712); <u>see</u> <u>also</u> <u>State v. Green</u>, 443 S.E.2d 14, 42 (N.C. 1994).  The right of allocution developed in a time in which the common-law judge had no discretion as to the punishment for felonies; as such, the point of the question to the defendant was not to elicit mitigating information.  <u>See</u> Barrett, <u>supra</u>, at 120-21.  Rather, the question was designed to afford the defendant a formal opportunity to present certain strictly-defined common-law grounds requiring the avoidance or delay of sentencing, including a claim that the defendant was not the person convicted, had the benefit of clergy, was insane, or was pregnant.  <u>See</u> <u>id.</u>; 1 Joseph Chitty, The Criminal Law 698, 761-62 (1841); 3 Charles Alan Wright, Federal Practice and Procedure § 525, at 82 (2d ed. 1982) ("The common law for many centuries has recognized the right of a defendant to 'allocution,' a formal statement by the defendant of any legal reason why he could not be sentenced.").

Since the mid-nineteenth century, however, modern

developments in criminal procedure, including the advent of sentencing discretion, the right of the accused to counsel, and the right of the accused to testify on his own behalf, have led to varied treatment of the right of allocution. See Barrett, supra, at 126-43. Some jurisdictions have concluded that the common-law right of allocution encompasses the right of the defendant to make unsworn statements to the jury that are not subject to cross-examination. See, e.g., Harris v. State, 509 A.2d 120, 127 (Md. 1986) ("We conclude that, under the common law applicable to capital sentencing proceedings at the time [the defendant] was sentenced, a defendant who timely asserts his right to allocute [before the jury], and provides an acceptable proffer, must be afforded a fair opportunity to exercise this right."); Homick v. State, 825 P.2d 600, 604 (Nev. 1992) ("We conclude that capital defendants in the State of Nevada enjoy the common law right of allocution [before the jury]."); State v. Zola, 548 A.2d 1022, 1046 (N.J. 1988) (recognizing under the court's supervisory power the right of a capital defendant to make an unsworn plea for mercy to the jury); State v. Lord, 822 P.2d 177, 216 (Wash. 1991) (indicating that the defendant had a right to make an unsworn plea for mercy before the jury that was not subject to cross-examination). However, other jurisdictions have held that no such common-law right exists. See, e.g., People v. Robbins, 755 P.2d 355, 369 (Cal. 1988) ("Given [that a capital defendant possesses the right to testify and offer other mitigating evidence], we fail to see the need, much less a

16

constitutional requirement, for a corresponding 'right to address the sentencer without being subject to cross-examination' in capital cases."); <u>People v. Kokoraleis</u>, 547 N.E.2d 202, 224 (Ill. 1989) (declining to exercise its supervisory power to recognize a rule "allowing defendants in capital sentencing hearings . . . to make a brief, unsworn plea for leniency without being subject to cross-examination"); <u>State v. Whitfield</u>, 837 S.W.2d 503, 514 (Mo. 1992) (en banc) ("Despite defendant's claim to the contrary, the right of allocution in Missouri does not extend to addressing the jury."); <u>State v. Perkins</u>, 481 S.E.2d 25, 41 (N.C.) ("[W]e have held that a defendant does not have a constitutional, statutory, or common law right to make unsworn statements of fact to the jury at the conclusion of a capital sentencing proceeding."), <u>cert. denied</u>, 118 S. Ct. 111 (1997); <u>Duckett v. State</u>, 919 P.2d 7, 22 (Okla. Crim. App. 1995) ("[W]e conclude that there is no statutory, common-law or constitutional right of a defendant to make a plea for mercy or otherwise address his sentencing jury, in addition to closing argument by counsel." (footnote omitted)); <u>State v. Stephenson</u>, 878 S.W.2d 530, 551 (Tenn. 1994) (holding that no common-law right of allocution exists in Tennessee because the right is nothing more than an empty formality in light of the criminal defendant's right to counsel).

Suffice it to say, Hall stands on shaky ground when he asserts that a general common-law right exists entitling a capital defendant to address the sentencing jury unsworn and not subject to cross-examination. Moreover, even if such a common-

17

law right existed, its continued recognition in federal capital cases would be inconsistent with the procedural framework for capital sentencing hearings established by the FDPA. As noted earlier, § 3593(c) vests the district court with a gatekeeping role in determining what information--both mitigating and aggravating--reaches the jury. It may exclude information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The Pennsylvania Supreme Court interpreted that state's capital sentencing scheme, which vests the trial court with similar authority, to abrogate any commmon-law right of the defendant to make unsworn statements to the jury on the following grounds:

> Whatever force the common law of allocution has with respect to other criminal cases, the General Assembly has abrogated that law and replaced it with statutory law devised specifically for first degree murder cases. The legislature has provided that a sentencing hearing is required at which evidence may be presented to the jury, or the judge as the case may be. The court is given discretion to determine what evidence will be received as relevant and admissible on the question of the sentence to be imposed. Following the presentation of evidence, counsel are permitted to argue to the sentencing body for or against the death sentence.
>
> It is apparent from the structure provided that this evidentiary hearing is intended to serve as part of the "truth-determining process" to enable the sentencer to discern and apply the facts bearing on the determination of the appropriate sentence. Implicit in the fact that the statute assigns to the defendant the burden of proving mitigating circumstances by a preponderance of evidence is the understanding that the jury is to asses[s] the evidence for credibility. It must be left open for the Commonwealth to challenge the veracity of facts asserted and the credibility of the person asserting those facts, whether that person is a witness or the defendant. We find no reason in law or

18

> logic why the defendant's presentation of evidence in support of his claim that life imprisonment is the appropriate sentence should be shielded from the testing for truthfulness and reliability that is accomplished by cross-examination.

Abu-Jamal, 555 A.2d at 857-58. We find this analysis persuasive in construing the FDPA. We therefore conclude that Hall possessed no federal common-law right to allocute before the jury.

### 3. Allocution as an Independent Constitutional Right

Hall next asserts that he possesses a constitutional right to allocute before the jury. The Supreme Court has never squarely addressed the issue of whether a defendant who affirmatively requests the opportunity to allocute, either before the court or the jury, is denied due process by the trial court's refusal to grant the request. In Hill v. United States, 368 U.S. 424 (1962), the Court held that a district court's failure to expressly ask a defendant represented by counsel whether he wished to make a statement before imposition of sentence was not an error of constitutional dimension and therefore provided no basis for a § 2255 collateral attack upon the defendant's sentence. See id. at 428. The court expressly declined to consider whether the district court's denial of an affirmative request by a defendant to make a statement prior to the imposition of sentence would rise to the level of constitutional error. See id. at 429; see also McGautha v. California, 402 U.S. 183, 219 n.22 (1971) (noting that whether a trial court's denial of a defendant's request to plead for mercy rises to the level of

19

a constitutional violation remains an open question), vacated in part on other grounds, Crampton v. Ohio, 408 U.S. 941 (1972).

We conclude that a criminal defendant in a capital case does not possess a constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination. In Green v. United States, 365 U.S. 301 (1961), Justice Frankfurter observed that the ultimate value of allocution as a procedural right in the context of modern criminal procedure rests in the fact that "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself." Id. at 304. Neither the government nor Hall contends that Hall would not have been permitted to testify at the sentencing hearing and thereby in his own words introduce "any information relevant to a mitigating factor." 18 U.S.C. § 3593(c). We simply cannot conclude that fundamental fairness required that Hall be allowed to make such a statement without being sworn or subject to cross-examination.[7] This conclusion is bolstered by the varied

---

[7] Hall directs our attention to United States v. Moree, 928 F.2d 654, 656 (5th Cir. 1991), in which we in passing described a criminal defendant's right to allocute under the subsection of Rule 32 that now occupies subsection (c)(3)(C) as "constitutional [in] dimension." Id. at 656. However, as noted earlier, we have not construed Rule 32(c)(3)(C) as affording a defendant a right to make a statement before the jury; rather, the rule merely requires the court to allow the defendant to make a statement at some point before it actually imposes sentence. As such, no conflict exists between Moree's statement that the right to allocute afforded by Rule 32(c)(3)(C) is of constitutional dimension and our conclusion here that a criminal defendant possesses no constitutional right to make an unsworn statement of remorse before the jury that is not subject to cross-examination.

20

conclusions that the states have reached, discussed supra, as to whether a criminal defendant has a right to make an unsworn statement of remorse or plea for mercy before a sentencing jury. Cf. Medina v. California, 505 U.S. 437, 446 (1992) ("Historical practice is probative of whether a procedural rule can be characterized as fundamental.").

## 4. Denial of Procedural Parity

Hall next contends that, even if the Constitution does not vest criminal defendants with an independent, per se right to make an unsworn statement in allocution before the jury, the district court's denial of his request to make such a statement was nonetheless unconstitutional because the district court allowed the government to introduce similarly nontestimonial victim impact statements. Hall contends that such disparate treatment constitutes an unconstitutional disruption of "the balance of forces between the accused and his accuser." Wardius v. Oregon, 412 U.S. 470, 474 (1973). We disagree.

The constitutionally required balance between prosecution and defense is "a balance between the total advantages enjoyed by each side rather than an insistence on symmetry at every stage in the process." Tyson v. Trigg, 50 F.3d 436, 441 (7th Cir. 1995). In this case, we conclude that no significant imbalance existed in the total advantages afforded Hall and the government at sentencing. First, contrary to Hall's contention, the district court actually allowed him to present evidence of a type similar to the victim impact statements. Specifically, the district

21

court allowed Hall to introduce hearsay evidence of his own remorse in the form of his sister's testimony of his statements of remorse to her when she visited him in prison. The government was not allowed to cross-examine Hall as to the contents of these statements.

Second, Agnes Rene, Lisa Rene's mother and the author of one of the three victim impact statements introduced at sentencing, testified during the sentencing hearing regarding the impact of the loss of her daughter. Hall declined to cross-examine her. This provides a strong indication that Hall did not consider cross-examination of the makers of the victim impact statements to be vital--or, for that matter, even beneficial--to his defense.

Third, the district court's refusal to allow Hall to make an unsworn statement that was not subject to cross-examination constituted at best a marginal procedural disadvantage. Had Hall taken the stand and offered limited testimony in substance equivalent to his proffered statement in allocution, he would have waived his Fifth Amendment privilege against self-incrimination only as to matters reasonably related to the contents of that statement. See Brown v. United States, 356 U.S. 148, 156 (1958) (holding that a criminal defendant "could not take the stand to testify in her own behalf and also claim the right to be free from cross-examination on matters raised by her own testimony on direct examination" (emphasis added)); United States v. Hernandez, 646 F.2d 970, 979 (5th Cir. Unit B June

22

1981) (noting that, in cross-examining a criminal defendant who chooses to testify, "[t]he government's questions must be reasonably related to the subjects covered by the defendant's direct testimony." (internal quotation marks omitted)).

A great deal of the type of information that the government would have likely sought to admit to impeach Hall's testimony or directly refute his claims of remorse and acceptance of responsibility was admitted as direct evidence of aggravating factors during the sentencing hearing, particularly the nonstatutory factor that "Hall constitutes a future danger to the lives and safety of other persons." Specifically, the government offered evidence of Hall's prior convictions and unadjudicated offenses. Additionally, the government introduced the testimony of Larry Nichols, one of Hall's fellow inmates at the correctional facility where Hall was incarcerated prior to trial. Nichols testified that Hall joked and bragged about repeatedly raping Lisa Rene. He also testified that Hall told him that, given the opportunity, he would kill Steven Beckley because, were it not for Beckley's assistance, the government would have had no case against him. Additionally, Nichols testified that Hall informed him of his plans to attempt to escape from the correctional facility in which they were incarcerated by taking his lawyer hostage using a "shank," a homemade knife. Hall has pointed to no information that would have been rendered relevant by virtue of his offering testimony similar in substance to his proffered statement in allocution which the government did not

23

present as direct support of the aggravating factors the existence of which it sought to prove during the sentencing hearing. Thus, we conclude that the district court's decision to admit victim impact statements offered by the government but to exclude Hall's request to make an unsworn statement in allocution to the jury did not unconstitutionally skew the balance of procedural advantage in the government's favor.

### 5. Violation of § 3593's Evidentiary Standards

Hall next argues that the district court abused its discretion in declining to allow him to make an unsworn statement of remorse and plea for mercy before the jury. Section 3593(c) provides that information need not be admissible under the Federal Rules of Evidence in order to be admissible at a hearing conducted pursuant to the statute. However, the statute provides that the district court may exclude information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). The district court has "considerable discretion in controlling the presentation of the 'information' to the jury in both content and form." United States v. McVeigh, 944 F. Supp. 1478, 1487 (D. Colo. 1996).

Assuming that an unsworn statement such as the one Hall proffered is theoretically admissible during an FDPA sentencing hearing,[8] we conclude that the district court did not abuse its

---

[8] It is at least arguable that the district court may have discretion to admit an unsworn statement of remorse by the defendant because the general requirement that witnesses in

24

discretion in declining to admit it.  The district court could properly conclude that the danger that Hall's unsworn, uncross-examinable testimony would mislead the jury outweighed the probative value of the information conveyed in the testimony, particularly given the fact that such information was readily available in a superior form:  Hall's sworn testimony, which would have been subject to testing for truthfulness and accuracy through cross-examination by the government.

### B. Conditioning the Presentation of Psychiatric Evidence on Submission to a Psychiatric Examination

Hall next contends that the district court erred in conditioning his right to present psychiatric evidence in mitigation of punishment upon his submission to a government psychiatric examination prior to trial.  Hall first argues that the district court could not properly compel him to undergo a government psychiatric examination as a condition upon his being allowed to introduce psychiatric evidence at sentencing because doing so unconstitutionally forced him to choose between exercising his Fifth Amendment privilege against self-incrimination and his Eighth Amendment right to present evidence in mitigation of punishment.  We disagree.

This court has long recognized that "a defendant who puts his mental state at issue with psychological evidence may not

---

criminal cases be sworn stems from Rule 603 of the Federal Rules of Evidence.  See FED. R. EVID. 603 ("Before testifying, every witness shall be required to declare that the witness will testify truthfully, by oath or affirmation administered in a form calculated to awaken the witness' conscience and impress the witness' mind with the duty to do so.").

25

then use the Fifth Amendment to bar the state from rebutting in kind." Schneider v. Lynaugh, 835 F.2d 570, 575 (5th Cir. 1988). This rule rests upon the premise that "[i]t is unfair and improper to allow a defendant to introduce favorable psychological testimony and then prevent the prosecution from resorting to the most effective and in most instances the only means of rebuttal:  other psychological testimony."  Id. at 576.

Hall correctly notes that he did not waive his Fifth Amendment privilege against self-incrimination merely by giving notice of his intention to submit expert psychiatric testimony at the sentencing hearing.  See Brown v. Butler, 876 F.2d 427, 430 (5th Cir. 1989) (holding that the state could not introduce expert testimony based upon a previous psychological examination of the defendant where the defendant announced an intention to offer expert psychological evidence but never actually did so). However, had he actually offered such evidence, the district court would not have violated Hall's privilege against self-incrimination by admitting psychiatric testimony subsequently offered by the government.  Hall's claim that the district court could not condition his right to introduce expert psychiatric evidence based upon out-of-court examination of Hall upon his submission to a government psychiatric examination therefore lacks merit.  In the same sense that Hall could not himself testify at the sentencing hearing regarding his remorse or acceptance of responsibility and then refuse cross-examination on this issue, he could not offer expert psychiatric testimony based

26

upon his own statements to a psychiatrist and then deny the government the opportunity to do so as well in rebuttal.  See Estelle v. Smith, 451 U.S. 454, 461-69, 472 (1981) (holding that the admission of statements made by the defendant during a pretrial psychiatric examination violated his Fifth Amendment privilege against compelled self-incrimination because he was not advised before the examination that he had a right to remain silent and that any statement that he made could be used against him at a capital-sentencing hearing, but noting that "a different situation arises where a defendant intends to introduce psychiatric evidence at the penalty phase"); Vanderbilt v. Collins, 994 F.2d 189, 196 (5th Cir. 1993) ("If a defendant requests a [psychiatric] examination on the issue of future dangerousness or presents psychiatric evidence at trial, the defendant may be deemed to have waived the fifth amendment privilege.").[9]

Hall, along with the American Orthopsychiatric Association and the American Association on Mental Retardation as amici curiae, argues in the alternative that, in order to adequately safeguard his Fifth Amendment privilege against self-

---

[9]  By incorporating some of the pleadings that he filed at the district court level in his brief, Hall also attempts to reurge his argument asserted in the district court that the district court lacked statutory authority to order him to submit to a psychiatric examination.  Because Hall has not adequately briefed this issue, we decline to address it.  See Yohey v. Collins, 985 F.2d 222 (5th Cir. 1993) (declining to consider arguments in other pleadings that the appellant attempted to incorporate by reference in a brief already in excess of the 50-page limit).

incrimination, the district court could not order a government psychiatric examination unless it sealed the results of the examination until the penalty phase of trial. Otherwise, he argues, he could have no guarantee that the government would not utilize the results of the examination or the fruits thereof as evidence in the guilt phase of his trial. This argument lacks merit.

The Supreme Court has held that, when a defendant claims that the government has sought to introduce the fruits of a coerced confession, the defendant "must go forward with specific evidence demonstrating taint," upon which the government "has the ultimate burden of persuasion to show that its evidence is untainted." Alderman v. United States, 394 U.S. 165, 183 (1969); see also Nardone v. United States, 308 U.S. 338, 341 (1939) ("[T]he trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin."); United States v. Cherry, 759 F.2d 1196, 1207 (5th Cir. 1985) ("It is firmly established that, once the defendant goes forward with specific evidence demonstrating taint, the government has the final burden of persuasion to show that the evidence is untainted."); 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.2(b), at 45 (3d ed. 1996).

We are convinced that this evidentiary framework provides all of the protection against the introduction of the fruits of

28

the government psychiatric examination prior to Hall's introduction of psychiatric evidence that the Constitution requires.  Had Hall undergone the government psychiatric examination and believed that the government was improperly seeking to introduce evidence that it derived from the examination, he could have precluded the introduction of such evidence by offering some evidence of taint.  The district court would have been required to exclude the evidence unless the government could carry its burden of persuading the court that the evidence was not tainted.

The only specific safeguard that Hall requested in his motion opposing the government's request for a psychiatric examination and oral argument on this motion was the sealing of the results of the examination until the penalty phase of his trial.  Hall has cited several cases in which district courts have imposed such a safeguard.  See United States v. Beckford, 962 F. Supp. 748, 761 (E.D. Va. 1997); United States v. Haworth, 942 F. Supp. 1406, 1408-09 (D.N.M. 1996); United States v. Vest, 905 F. Supp. 651, 654 (W.D. Mo. 1995).  While we acknowledge that such a rule is doubtless beneficial to defendants and that it likely advances interests of judicial economy by avoiding litigation over whether particular pieces of evidence that the government seeks to admit prior to the defendant's offering psychiatric evidence were derived from the government psychiatric examination, we nonetheless conclude that such a rule is not constitutionally mandated.

Our conclusion in this regard is bolstered by Rule 12.2(c) of the Federal Rules of Criminal Procedure, which provides that, when a defendant intends to rely upon an insanity defense during the guilt phase of his trial, the district court may order a mental examination upon motion by the government. See FED. R. CRIM. P. 12.2(c). In order to safeguard the defendant's privilege against self-incrimination, the rule provides as follows:

> No statement made by the defendant in the course of any examination provided for by this rule, whether the examination be with or without the consent of the defendant, no testimony by the expert based upon such statement, and no other fruits of the statement shall be admitted in evidence against the defendant in any criminal proceeding except on an issue respecting mental condition on which the defendant has introduced testimony.

Id. Noticeably absent from the rule is any requirement that the government be denied access to the results of the examination until after the defendant actually introduces testimony regarding his mental condition. Rather, the rule merely precludes the government from introducing as evidence the results of the examination or their fruits until after the defendant actually places his sanity in issue. Yet the rule has consistently been held to comport with the Fifth Amendment. See, e.g., United States v. Lewis, 53 F.3d 29, 35 n.9 (4th Cir. 1995); United States v. Stockwell, 743 F.2d 123, 127 (2d Cir. 1984) ("[W]hile we do not wish to encourage the practice of requiring defendants to submit to a psychiatric examination in the prosecutor's presence (either in person or through the use of a tape

30

recording), such a procedure cannot be said to constitute a per se violation of Rule 12.2(c) and the defendant's Fifth Amendment rights."). Given that the government presents its case-in-chief during the guilt phase prior to the defendant, we perceive no functional distinction between the risk that the government will improperly utilize the fruits of a psychiatric examination undertaken pursuant to Rule 12.2 during its case-in-chief (and thus prior to the defendant's offering psychiatric evidence of insanity) and the risk that the government in this case would improperly utilize the fruits of the court-ordered psychiatric examination prior to Hall's introduction of psychiatric evidence during the penalty phase.[10] We therefore reject Hall's contention that the district court violated his Fifth Amendment privilege against self-incrimination by ordering him to undergo a psychiatric examination as a condition upon his offering psychiatric evidence during the sentencing hearing or by declining to order the results of the examination sealed until

---

[10] It is also worth noting that, had the district court granted Hall's request to seal the results of the examination until after the guilt phase, it would not have eliminated the risk that the government would have, either inadvertently or intentionally, introduced the results of the examination or their fruits prior to Hall's waiver of his privilege against self-incrimination by placing his mental state at issue. Section 3593(c) provides that, during the sentencing hearing, "[t]he government shall open the argument." 18 U.S.C. § 3593(c). To the extent that, pursuant to Hall's request, the government would have had access to the results of the psychiatric examination after the guilt phase but prior to the sentencing hearing, a risk would exist that the government would improperly utilize the results or their fruits during its initial presentation of information to the jury on sentencing.

31

the sentencing hearing.[11]

### C. Admission of Unduly Prejudicial Evidence

Hall next claims that the district court abused its discretion by admitting certain evidence which he claims was irrelevant and highly prejudicial.  Specifically, he complains of the district court's admission of (1) graphic photographs of Lisa Rene's body; (2) a videotape depicting a walk through Byrd Lake Park to the grave site, surveillance of the area where Lisa Rene's burned clothing was recovered, and an examination of the grave site during the exhumation of Lisa Rene's body; and (3) testimony by Hall's girlfriend in which she claimed to have been robbed at gunpoint while purchasing drugs for Hall.  We review a district court's evidentiary rulings for an abuse of discretion. See United States v. Torres, 114 F.3d 520, 525-26 (5th Cir.), cert. denied, 118 S. Ct. 316 (1997).

### 1. Photographs

Hall claims that the district court abused its discretion by admitting photographs of Lisa Rene's body in the grave and after its removal during the guilt phase of his trial.  Hall first argues that the photographs were rendered legally irrelevant by the fact that he offered to stipulate to the identity of the victim and her cause of death.  Additionally, Hall complains that

---

[11]  We express no opinion on whether reversal would have been warranted if Hall had requested lesser safeguards, such as an order that the government utilize neither the results of the psychiatric examination nor their fruits prior to his presentation of psychiatric evidence during the sentencing hearing and the district court had ordered the examination without imposing such safeguards.

the photographs were particularly gruesome because they depicted Lisa Rene's body in a state of decomposition. He also argues that the photographs were cumulative of detailed testimony of a medical examiner regarding the condition of Lisa Rene's body. As such, he argues that the district court's admission of the photographs violated Rule 403 of the Federal Rules of Evidence because any probative value the photographs might have possessed was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.

We note as an initial matter that the photographs were relevant to Lisa Rene's identity and the cause of her death, and Hall's offer to stipulate to these facts did not render them irrelevant. The advisory committee notes to Rule 401 of the Federal Rules of Evidence, which establishes the definition of legal relevance, speak directly to this issue:

> The fact to which the evidence is directed need not be in dispute. While situations will arise which call for the exclusion of evidence offered to prove a point conceded by the opponent, the ruling should be made on the basis of such considerations as waste of time and undue prejudice (see Rule 403), rather than under any general requirement that evidence is admissible only if directed to matters in dispute.

FED. R. EVID. 401 advisory committee notes. The reason that a criminal defendant cannot typically avoid the introduction of other evidence of a particular element of the offense by stipulation is that the government must be given the opportunity "to present to the jury a picture of the events relied upon. To

33

substitute for such a picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight." Old Chief v. United States, 117 S. Ct. 644, 653 (1997) (internal quotation marks omitted). Our sole inquiry, then, is whether admission of the photographs violated Rule 403. See id. at 650 ("If . . . relevant evidence is inadmissible in the presence of other evidence related to it, its exclusion must rest not on the ground that the other evidence has rendered it 'irrelevant,' but on its character as unfairly prejudicial, cumulative or the like, its relevance notwithstanding."). We conclude that admission of the photographs did not violate Rule 403.

In United States v. McRae, 593 F.2d 700 (5th Cir. 1979), this court addressed a Rule 403 challenge to the district court's admission in a murder trial of numerous photographs of the victim and the death scene which the district court had described as "gross, distasteful and disturbing." See id. at 707. One of these photographs was "a view of [the victim's] corpse, clothed in her bloody garments, bent forward so as to display an exit wound in the back of her skull produced by part of [the defendant's] dum-dum bullet, which exploded in her brain"; another was "a front view of [the victim's] body, seated in the chair where she died, her left eye disfigured by the bullet's entry and her head broken by its force." Id. In holding that the admission of these photographs did not violate Rule 403, we observed,

34

> Relevant evidence is inherently prejudicial; but it is
> only <u>unfair</u> prejudice, <u>substantially</u> outweighing
> probative value, which permits exclusion of relevant
> matter under Rule 403.  Unless trials are to be
> conducted on scenarios, on unreal facts tailored and
> sanitized for the occasion, the application of Rule 403
> must be cautious and sparing.

<u>Id.</u>  We see no basis for distinguishing between the photographs at issue in <u>McRae</u> and those at issue here.  We therefore conclude that the district court did not abuse its discretion in concluding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice or by concerns regarding the needless presentation of cumulative evidence.  <u>See</u> <u>United States v. Rezaq</u>, 134 F.3d 1121, 1138 (D.C. Cir. 1998) (upholding a district court's admission of an autopsy photograph showing the removal of a bullet from a hijacking victim's head even though the photograph was only probative of the fact that the victim was shot in the head, a "point [that] did not especially need elucidation"); <u>United States v. Analla</u>, 975 F.2d 119, 125-26 (4th Cir. 1992) (holding that the district court did not abuse its discretion in admitting photographs depicting two gunshot wounds to a robbery victim's head and another photograph depicting an individual murdered during the robbery lying in a pool of blood); <u>United States v. Bowers</u>, 660 F.2d 527, 529-30 (5th Cir. Unit B Sept. 1981) (holding that the district court did not abuse its discretion in admitting a color photograph of a child's lacerated heart to prove cause of death and noting "that the mere fact that appellant stipulated with the government as to the cause of death did not preclude the

government from offering proof on that issue").

## 2. Videotape

Hall next contends that the district court abused its discretion in admitting during the penalty phase of his trial a videotape depicting a walk through the park in which Lisa Rene was killed, the area where her burned cloths were recovered, and the exhumation of her body. He further complains that the district court erred by allowing the jury to view the tape during deliberations when they had not previously viewed it in open court.

We conclude that the district court did not abuse its discretion in concluding that the videotape's "probative value [was not] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). As the government points out, the videotape was relevant to the aggravating factor that the killing was committed in a heinous, cruel, or depraved manner in that it depicted the path through the woods toward the grave site that Hall and his cohorts forced Lisa Rene to walk barefoot on two occasions. Moreover, the depiction of the grave site demonstrated the amount of planning that went into the murder and was thus probative regarding the aggravating factor that the murder was committed with substantial planning and premeditation.

Even if we were to conclude that the district court abused its discretion in admitting the videotape, such error was harmless. An erroneous evidentiary ruling constitutes harmless

36

error if it does not affect the substantial rights of the complaining party. See Torres, 114 F.3d at 526; see also United States v. Asibor, 109 F.3d 1023, 1032 (5th Cir.), cert. denied, 118 S. Ct. 254, and cert. denied, 118 S. Ct. 638 (1997). An error is deemed to have affected a criminal defendant's substantial rights if it "'had substantial and injurious effect or influence in determining the jury's verdict.'" United States v. Lowery, 135 F.3d 957, 959 (5th Cir. 1998) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

We conclude that the videotape could not have had a substantial and injurious effect or influence on the jury's sentencing recommendation because, as Hall concedes, the contents of the tape were largely cumulative of the testimony and photographs admitted during the guilt phase of Hall's trial. See United States v. Allie, 978 F.2d 1401, 1409 (5th Cir. 1992) (stating that the improper admission of evidence that is merely cumulative constitutes harmless error); 3A CHARLES ALAN WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 854, at 311 (2d ed. 1982) ("Error in the admission of evidence is harmless if the facts shown by that evidence are already before the jury through other properly-admitted evidence.").

As to Hall's claim that the district court improperly allowed the jury to view the videotape during deliberations even though the jury had not previously viewed the tape in open court, our review is sharply circumscribed by the scope of Hall's objection when the district court admitted the tape into

37

evidence.  Hall objected to the admissibility of the tape; however, he did not object to the district court's decision to allow the jurors to view the tape only at their discretion during deliberations.  Accordingly, we review Hall's claim that the jury should not have been allowed to view the tape during deliberations when they had not previously viewed it in open court for plain error.  See FED. R. CRIM. P. 52(b); United States v. Jones, 132 F.3d 232, 243 (5th Cir. 1998).

Under the plain error standard, we may reverse only if "(1) there was error (2) that was clear and obvious and (3) that affected [Hall's] substantial rights."  United States v. Dupre, 117 F.3d 810, 817 (5th Cir. 1997), cert. denied, 118 S. Ct. 857 (1998); see also United States v. Olano, 507 U.S. 725, 731-36 (1993).  "Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of [the plain error inquiry]."  Olano, 507 U.S. at 735.  Even when these criteria are satisfied, we should exercise our discretion to reverse only if the error "seriously affects the fairness, integrity or public reputation of judicial proceedings."  Id. at 732 (internal quotation marks and brackets omitted); see also Dupre, 117 F.3d at 817.

Assuming that the district court erred in allowing the jury to view the videotape only during deliberations, we cannot say that such error was open or obvious nor that it affected Hall's substantial rights.  The only prejudice that Hall alleges

38

resulted from the fact that the jurors did not view the tape in open court was that his counsel was prevented from making a record of any excessive or prejudicial responses to the evidence. However, Hall has cited no cases in which this court's evaluation of evidentiary rulings hinged upon the jury's actual reactions to the purportedly inadmissible evidence. Moreover, we note that, by giving the jury discretion as to whether to view the videotape, Hall was, at least in a limited sense, benefitted by the fact that the jury may not have viewed the tape. This is a possibility that would not have existed had the district court chosen to play the tape in open court. That may very well have been the reason that Hall's attorneys did not object to the district court's decision not to play the videotape in open court in the first place. Hall thus has not established that the district court's decision not to play the videotape in open court rises to the level of plain error.

### 3. Testimony Regarding Robbery of Hall's Girlfriend

Hall next complains of the district court's admission of the testimony of LaTonya Anders, Hall's girlfriend, that she was robbed while in Houston attempting to purchase crack cocaine on Hall's behalf while he was on parole and that he continued to send her to purchase drugs after these incidents. This testimony was generally relevant to Hall's future dangerousness in that (1) it demonstrated the lengths to which Hall would go to continue his drug trafficking activities and (2) it demonstrated that he was an organizer and leader of criminal activity. While the

39

small amount of testimony regarding Anders's robbery may have had little, if any, relevance to the aggravating factors that the government sought to prove, we are confident that, given the heinousness of the offense of which Hall was convicted, this isolated testimony could not have had a substantial and injurious effect or influence on the jury's sentencing recommendation. As such, any error in its admission was harmless.

### D. Evidence of Unadjudicated Offenses

Hall contends that the district court improperly admitted evidence of unadjudicated offenses during the penalty phase. Specifically, Hall complains of the district court's permitting the government to introduce the testimony of Erma Willis and her son, Geren Willis, that, in May 1994, Hall waited in a car outside their home with a gun on the dashboard while Hall's cousin forced another individual to attempt to obtain money from Ms. Willis. David Baker, who at that time was employed as an Arkansas parole officer, testified that Ms. Willis reported the incident to him and that he forwarded the information to Hall's parole officer in Pine Bluff. Additionally, Hall complains of the testimony of Larry Nichols, an inmate in the same correctional facility where Hall was held prior to his trial, regarding Hall's plans to escape from prison and his threats against Beckley, discussed in Part II.A.4, supra.

Hall complains that introduction of the above testimony violated due process and the Eighth Amendment's "heightened 'need for reliability in the determination that death is the

40

appropriate punishment in a specific case.'" Caldwell v. Mississippi, 472 U.S. 320, 340 (1985) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976)). He contends that this problem was compounded by the fact that the district court did not instruct the jury that, in order to consider unadjudicated criminal offenses in determining whether the government had established a particular aggravating factor, it was required to conclude that the government had proven the occurrence of the unadjudicated offense by a particular quantum of proof. With respect to Nichols's testimony, Hall contends that the district court's failure to instruct the jury regarding the evidentiary standard by which it was required to determine whether the conduct about which Nichols testified actually occurred allowed the jury to "conflate the process of fact-finding and risk assessment" by concluding that "the nature of the conduct Nichols alleged was so menacing that only a marginal amount of proof would suffice to warrant consideration of that conduct in support [of] the government's claim of future dangerousness."

To the extent that Hall alleges that evidence of prior unadjudicated offenses is per se inadmissible on constitutional grounds, his claim lacks merit. See Harris v. Johnson, 81 F.3d 535, 541 (5th Cir. 1996) ("We previously have held that the use of evidence of unadjudicated extraneous offenses, at the sentencing phase of Texas capital murder trials, does not implicate constitutional concerns."); Williams v. Lynaugh, 814 F.2d 205, 208 (5th Cir. 1987) (holding "that the admission of

41

unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments"); Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir. 1984) (same).

We are likewise unpersuaded by Hall's contention that the absence of an instruction regarding the evidentiary standard by which the government must prove the existence of unadjudicated offenses and other conduct that it advances in support of an aggravating factor constitutes reversible error.  As we understand it, Hall's argument appears to be that, when the government offers evidence of an unadjudicated offense in support of an aggravating factor, the jury must be instructed that it cannot consider this evidence in determining whether the government has carried its burden of proving the aggravating factor beyond a reasonable doubt unless it has first determined that the evidence establishes by some quantum of evidence that the unadjudicated offense occurred.[12]  Hall has offered no legal support for this proposition, and the only precedent that we have found militates against it.  See Harris, 81 F.3d at 541 ("Fully aware that the due process clause clearly requires that for conviction the state must prove the elements of the offense charged beyond a reasonable doubt, neither we nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated offenses in a capital case

---

[12]  Hall has not specified what quantum of evidence, e.g., substantial evidence, preponderance of the evidence, clear and convincing evidence, beyond a reasonable doubt, he considers appropriate.

42

sentencing hearing.").

In any event, Hall neither proffered a proposed jury instruction informing the jury of the existence of the government's purported threshold evidentiary burden regarding unadjudicated offenses nor objected to the absence of such an instruction. He therefore did not preserve any error regarding the absence of this instruction. See FED. R. CRIM. P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."). The dearth of authority supporting Hall's position indicates that, even if the district court erred in failing to instruct the jury on the existence of a threshold evidentiary burden regarding unadjudicated offenses, such error was far from clear and obvious and thus did not constitute plain error warranting reversal. See FED. R. CRIM. P. 52(b); Dupre, 117 F.3d at 817.

### E.  Victim Impact Statements

Hall next contends that the district court committed reversible error by admitting three victim impact statements from Lisa Rene's relatives during the sentencing hearing. In this regard, Hall contends that (1) the victim impact statements introduced an arbitrary element into the jury's sentencing recommendation, thereby violating the Eighth Amendment and (2) admission of the statements violated his Sixth Amendment right to confrontation. We address each of these arguments in turn.

43

## 1. Eighth Amendment Arbitrariness

Hall contends that the victim impact statements "injected emotional considerations that had no relevant purpose in the proceedings" and thereby violated the Eighth Amendment. We disagree.

In Payne v. Tennessee, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment erects no per se barrier to the admission of victim impact evidence during the sentencing phase of a capital trial. See id. at 827. In so doing, the Court observed that "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." Id. at 825. The Court went on to observe that "[t]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family." Id. (internal quotation marks omitted). The Court thus concluded that "[t]here is no reason to treat [victim impact] evidence differently than other relevant evidence is treated." Id. at 827. Victim impact evidence and argument based upon it therefore does not, by virtue of its substance, abridge a defendant's constitutional rights unless it "is so unduly prejudicial that it renders the trial fundamentally unfair." Id.

44

at 825; see also Castillo v. Johnson, 141 F.3d 218, 224 (5th Cir. 1998).

The victim impact statements admitted here were not so unduly prejudicial that they rendered the trial fundamentally unfair. By and large, the statements did nothing more than generally describe Lisa Rene's character and her aspirations of becoming a doctor as well as the pain that her family members felt as a result of her senseless death. Hall specifically complains of the following statement in the victim impact statement of Nicholson Rene, Lisa Rene's father:

> I feel I have nothing to look forward to[] . . . . If I was going to live twenty more years it will proba[b]ly be ten years. The loss of my daughter is killing me slowly inside. Since after the death of my daughter, I became a strong drinker.

We are confident that "this brief statement did not inflame [the jury's] passions more than did the facts of the crime." Payne, 501 U.S. at 832 (O'Connor, J., concurring). As such, the contents of the victim impact statements did not render Hall's trial fundamentally unfair.

### 2. Sixth Amendment Right to Confrontation

Hall next argues that the admission of nontestimonial victim impact statements violated his Sixth Amendment "right physically to face those who testify against him, and the right to conduct cross-examination." Pennsylvania v. Ritchie, 480 U.S. 39, 51 (1987). It is well established in this circuit that a criminal defendant's Sixth Amendment right of confrontation is sharply circumscribed in non-capital sentencing proceedings. See United

45

States v. Rodriquez, 897 F.2d 1324, 1328 (5th Cir. 1990). However, this circuit has not determined whether similar restrictions on a defendant's right to confrontation exist at a capital sentencing hearing.

In Williams v. New York, 337 U.S. 241 (1949), the Supreme Court held that the imposition of a death sentence "based upon information supplied by witnesses with whom the accused had not been confronted and as to whom he had no opportunity for cross-examination or rebuttal" did not violate the defendant's right to due process under the Fourteenth Amendment where the defendant had not requested the opportunity for cross-examination or otherwise impugned the accuracy of the statements. See id. at 243-44, 252. However, since its decision in Williams, the Supreme Court has "held that many of the protections available to a defendant at a criminal trial also are available at a sentencing hearing . . . in a capital case."[13] Bullington v. Missouri, 451 U.S. 430, 446 (1981). The Supreme Court's more recent jurisprudence regarding capital sentencing proceedings has led one circuit to conclude that the Sixth Amendment right to confrontation applies with full force in capital sentencing

---

[13] Moreover, it is significant that in Williams the Court addressed a due process challenge under the Fourteenth Amendment. The Court did not hold that the Sixth Amendment right to confrontation applied to the states via the Fourteenth Amendment's Due Process Clause until over fifteen years after Williams was decided. See Pointer v. Texas, 380 U.S. 400, 403 (1965). It is thus quite questionable whether Williams is controlling with respect to the determination of whether the Sixth Amendment right to confrontation extends to capital sentencing hearings.

46

hearings.  See Proffitt v. Wainwright, 685 F.2d 1227, 1254 (11th Cir. 1982) ("The Supreme Court's emphasis in [its recent] capital sentencing cases on the reliability of the factfinding underlying the decision whether to impose the death penalty convinces us that the right to cross-examine adverse witnesses applies to capital sentencing hearings.  The Supreme Court has recognized cross-examination as 'the "greatest legal engine ever invented for the discovery of truth."'" (quoting California v. Green, 399 U.S. 149, 158 (1970) (quoting 5 JOHN HENRY WIGMORE, EVIDENCE § 1367 (3d ed. 1940)))).  But see Bassette v. Thompson, 915 F.2d 932, 939 (4th Cir. 1990) (rejecting Proffitt and concluding that Williams dictates that a criminal defendant in a capital case has no right to cross-examine those who contribute information to the presentence report).  We therefore assume without deciding that the Confrontation Clause applies to the sentencing phase of a capital trial with the same force with which it applies during the guilt phase.

Confrontation Clause errors, like other trial errors, are subject to harmless-error analysis.  See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); United States v. Ismoila, 100 F.3d 380, 391 (5th Cir. 1996), cert. denied, 117 S. Ct. 1712, and cert. denied, 117 S. Ct. 1858 (1997).  Such an error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  Chapman v. California, 386 U.S. 18, 24 (1967).  Assuming that the admission of the victim impact statements constituted a violation of Hall's

47

right to confrontation, we conclude that the error in this case meets this standard. During the sentencing hearing, Agnes Rene, Lisa Rene's mother, presented emotionally charged testimony that doubtless demonstrated with abundant clarity to the jury the devastating impact of Hall's crime upon Lisa Rene's family. This testimony, coupled with the powerful evidence regarding the heinous, cruel, and depraved nature of this offense, leads us to conclude beyond a reasonable doubt that the jury's sentencing recommendation would not have changed had the district court not admitted the victim impact statements.[14] We therefore reject Hall's contention that the district court's admission of the victim impact statements requires vacatur of his sentence.

## F. Rejection of Cause Challenges to Venirepersons

Hall claims that the district court committed reversible error by denying several of his challenges for cause to certain venirepersons, thereby forcing him to utilize his peremptory challenges to keep these individuals off the jury. He further alleges that this error was of constitutional dimension because one juror against whom he asserted a challenge for cause actually served on the jury.

---

[14] In reaching this conclusion, we necessarily reject Hall's contention that his sentence must be vacated on the ground that the district court violated the evidentiary standard of § 3593 by admitting the victim impact statements. Even if the "probative value [of the statements was] outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury," 18 U.S.C. § 3593(c), to the extent that admission of the statements was harmless under the Chapman standard, it was necessarily harmless under the less stringent harmless-error standard applicable to nonconstitutional errors. See United States v. Lowery, 135 F.3d 957, 959 (5th Cir. 1998).

48

The Sixth Amendment right to an impartial jury requires the exclusion of a potential juror if his "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). A prospective juror is substantially impaired in his ability to perform his duties in accordance with his instructions and oath if he "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." Morgan v. Illinois, 504 U.S. 719, 729 (1992).

The Supreme Court has observed that a trial court's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record." Witt, 469 U.S. at 429; see also Fuller v. Johnson, 114 F.3d 491, 500 (5th Cir.) ("A trial judge's finding of bias during voir dire is a determination of fact . . . ."), cert. denied, 118 S. Ct. 399 (1997). As such, "deference must be paid to the trial judge who sees and hears the [prospective] juror." Witt, 469 U.S. at 426. "We will only second-guess the court's decision that a juror is unbiased if there is an abuse of discretion." United States v. Flores, 63 F.3d 1342, 1357 (5th Cir. 1995).

At this point, it is important to distinguish between the types of claims that Hall has asserted with respect to the district court's denial of his challenges for cause. Hall has

asserted that the district court's denial of his challenges for cause violated (1) his Sixth Amendment right to an impartial jury and (2) his statutory right to free exercise of his peremptory challenges and his due process right not to have that statutory right denied arbitrarily. Disposition of these claims requires the application of distinct legal analyses.

### 1. Sixth Amendment Right to Impartial Jury

In Ross v. Oklahoma, 487 U.S. 81 (1987), a direct criminal appeal from the Oklahoma Court of Criminal Appeals, the petitioner claimed that the trial court violated his Sixth Amendment right to an impartial jury, made applicable to the states via the Fourteenth Amendment Due Process Clause, by forcing him to expend one of his peremptory challenges to remove a venireperson who properly should have been removed for cause. Id. at 88. The Supreme Court rejected this argument because, although the trial court erroneously failed to strike the challenged venireperson for cause, he "was in fact removed and did not sit." Id. The Court acknowledged that the petitioner "was undoubtedly required to exercise a peremptory challenge to cure the trial court's error," id., but nonetheless concluded that this fact of itself did not establish a constitutional violation:

> [W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. They are a means to achieve the end of an impartial jury. So long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not

50

mean the Sixth Amendment was violated. We conclude
that no violation of petitioner's right to an impartial
jury occurred.

Id. (citations omitted); see also Herman v. Johnson, 98 F.3d 171,

174 (5th Cir. 1996), cert. denied, 117 S. Ct. 1262 (1997); United

States v. Prati, 861 F.2d 82, 87 (5th Cir. 1988).

Ross makes clear that, in disposing of Hall's Sixth

Amendment claim, our inquiry is limited to an evaluation of the

impartiality of the venirepersons who actually served on Hall's

jury. Hall has claimed that only one of his jurors, Stacey Leigh

Donaldson, was not impartial. Therefore, our determination of

whether Hall was denied his Sixth Amendment right to an impartial

jury begins and ends with a determination of whether the district

court abused its discretion in determining that Donaldson did not

possess "views [that] would prevent or substantially impair the

performance of [her] duties as a juror in accordance with [her]

instructions and [her] oath." Witt, 469 U.S. at 424 (internal

quotation marks omitted). We conclude that it did not.

Hall claims that the district court should have struck

Donaldson for cause solely because, when asked whether she could

consider the fact that a defendant grew up in a dysfunctional,

abusive family as a mitigating factor, she responded as follows:

> I don't know if I could or not. I would say my family
> was not exactly perfect, you know, and might to a
> degree be dysfunctional, but that doesn't give me the
> right to go out and commit violent acts.

This statement, particularly when taken in the context of the

rest of Donaldson's voir dire indicates nothing more than that

the degree of weight that Donaldson would afford family

51

background as a mitigator depended upon the level of abuse the defendant was forced to endure during childhood.  Specifically, Donaldson stated, "I think upbringing does, you know, to a degree have a factor, but it[s mitigating effect] would just depend upon what was brought to light as to what . . . happened to the person."  Clearly, the district court did not abuse its discretion in concluding that Donaldson lacked any bias that would substantially impair her ability to fulfill her oath as a juror and follow the court's instructions.  Because the district court did not abuse its discretion in finding that Donaldson was impartial and because Hall has not alleged partiality on the part of any of the other individuals who served on his jury, he has failed to establish a violation of his Sixth Amendment right to an impartial jury.

### 2. Statutory Right to Free Exercise of Peremptory Challenges and Due Process

We have observed that, "[w]hile peremptory challenges, or the number provided by Fed. R. Crim. P. 24(b) may not be constitutionally required, it does not follow that a trial court's wrongful reduction of the number so provided is not reversible error on direct appeal."  United States v. Munoz, 15 F.3d 393, 395 n.1 (5th Cir. 1994); see also United States v. Nell, 526 F.2d 1223, 1229 (5th Cir. 1976) ("[A]s a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges.").  We have further held that "[t]he

denial or impairment of the right to exercise peremptory challenges is reversible error without a showing of prejudice." United States v. Broussard, 987 F.2d 215, 221 (5th Cir. 1993); see also Swain v. Alabama, 380 U.S. 202, 219 (1965); Knox v. Collins, 928 F.2d 657, 661 (5th Cir. 1991); Nell, 526 F.2d at 1229 ("Since the effect of the [district court's erroneous denial of a challenge for cause by the defendant] was to reduce the number of peremptory challenges allowed the defense, we have no choice but to reverse.").

Hall contends that the district court impaired his free exercise of his peremptory challenges by forcing him to use seven of his peremptory challenges to exclude venirepersons whom the district court should have excused for cause. These venirepersons included Diane Schwartz George, Susan Norman, Vicki Lane, Judith Dallinger, Joyce McGough, Linda Faye Palmer, and Randal Davis. We consider Hall's arguments with respect to each challenged venireperson in turn.[15]

---

[15] In a footnote in his initial brief, Hall asserts that the district court should have struck a number of other venirepersons for cause. However, he provides no legal analysis as to why these venirepersons were impermissibly impaired. We therefore do not consider Hall's conclusory allegation that the district court should have stricken them for cause. See FED. R. APP. P. 28(a)(6) ("The argument must contain the contentions of the appellant on the issues presented, and the reasons therefor . . . ."); Bank One, Texas, N.A. v. Taylor, 970 F.2d 16, 27 (5th Cir. 1992) ("It is established law that matters which have not been adequately briefed are precluded from consideration on appeal.").

### a. Diane Schwartz George

Hall claims that Diane Schwartz George should have been struck for cause because (1) she stated in her juror questionnaire that she supported the death penalty because she believed it saved taxpayer money and that, as a taxpayer, she did not "appreciate paying the[] 'bills'" of "certain criminals"; (2) during voir dire, she stated that the fact that a defendant had an abusive childhood was "not something that would have much bearing" on her sentencing recommendation; and (3) when asked whether she could impose a life sentence if the government proved all of the aggravating factors as to which it gave Hall notice and the defendant established no mitigating factors, she responded that, "[w]ithout thinking about that more, I think I would have to say no," thereby saddling Hall with the burden of proving through mitigating factors that a sentence of death was inappropriate. We disagree.

First, while George indicated that, as a general matter, she favored the existence of the death penalty in part because of financial considerations, she also expressly stated that she would be able to base her decision on whether or not to impose the death penalty in this case solely upon the evidence presented during the trial. The district court could thus properly conclude that George was capable of "set[ting] aside [her] own predilections in deference to the rule of law." Flores, 63 F.3d at 1356.

Second, George indicated that she could consider evidence of

54

an abusive childhood as a mitigating factor but that such evidence might not weigh strongly in her determination of whether the death penalty constituted an appropriate penalty in a particular case. Further, she indicated that the degree of mitigation that such evidence would warrant depends upon the strength of the evidence of abuse. The Constitution does not require that a juror be willing to give a mitigating factor any particular amount of weight; it only requires that the juror manifest an ability to consider such factors in determining whether death is an appropriate punishment. See Eddings v. Oklahoma, 455 U.S. 104, 114-15 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence. But [it] may not give it no weight by excluding such evidence from [its] consideration."); Cordova v. Collins, 953 F.2d 167, 172 (5th Cir. 1992) (holding that the defendant could not "make an arguable constitutional claim" based upon the trial court's failure to strike for cause a venireperson who "stated in voir dire that he would consider evidence of intoxication as a mitigating circumstance, but did not believe that that factor was entitled to receive much weight").

Third, George's statement that, "without thinking about it more," she believed that, in the absence of mitigating factors, she could not consider life imprisonment as an option if the government proved an aggravating factor beyond a reasonable doubt might, considered in a vacuum, indicate bias. However, George previously stated in response to a question by the government

55

that, even in the absence of mitigating factors, she could consider the possibility of life imprisonment. Additionally, she expressly stated that she could follow the district court's instructions. Moreover, the answer was given in response to a rather complex question by defense counsel. Having heard and viewed the entire voir dire firsthand, the district court concluded, "based on the whole record, that [George] will consider all of the things she's supposed to consider, including if there's only aggravating factors presented, whether those aggravating factors should be enough for a vote for death or whether they are insufficient for death." On the basis of a cold appellate record, we cannot say that this determination constituted an abuse of discretion.

### b. Susan Norman

Hall claims that Susan Norman should have been struck for cause because (1) she stated during voir dire that, "[i]f a person takes another life in malice without feeling or remorse for such act, that person I believe should be punished to the full extent of the law"; (2) when asked whether a dysfunctional or physically abusive family would militate against a death sentence, she responded, "I believe people can overcome things like that"; and (3) she indicated that she would "lean towards the death penalty" if the government proved one or more aggravating factors beyond a reasonable doubt and the defense offered no mitigating factors. We find these arguments unpersuasive.

56

First, while Norman indicated that she had a favorable attitude toward the death penalty, she also indicated that she would give "honest consideration" to any mitigating factor raised by the defendant. See Flores, 63 F.3d at 1356 (observing that the Constitution requires the trial court to exclude only those jurors "who cannot set aside their own predilections in deference to the rule of law"). Second, just after her statement that she generally believed that people can overcome abusive childhoods, she stated, "I know in a lot of cases they can't." Norman's statements fall far from indicating that she would not consider such evidence. Third, the fact that Norman indicated that she would lean toward the death penalty if the government proved the existence of aggravating factors beyond a reasonable doubt and the defendant established no mitigating factors does not of itself indicate that she would be substantially impaired in her ability in that circumstance to weigh the evidence and determine whether death was an appropriate sentence. We therefore conclude that the district court did not abuse its discretion in denying Hall's challenge for cause to Norman.

### c. Vicki Lane

Hall claims that Vicki Lane should have been struck for cause because (1) she demonstrated general hostility to the prospect of life imprisonment for convicted murderers when she stated on a jury questionnaire, "I believe life without parole is a waste and a burden, financially and morally, to our state"; and (2) she indicated that she did not consider the existence of

57

equally culpable defendants who did not receive the death penalty to be a mitigating factor.  We reject these arguments.

During voir dire, Lane made abundantly clear that she considered herself fully capable of weighing aggravating and mitigating factors in determining an appropriate sentence and that the fact that a defendant had committed premeditated murder would not close her mind to the possibility of a life sentence. She also stated that she understood that financial considerations regarding keeping a defendant in prison for the rest of his life could not enter her consideration of the appropriate sentence and that she would follow the court's instructions fully in serving as a juror.  Moreover, she stated that, upon reaching a verdict of guilty, she would remain equally open to all sentencing options.  Additionally, the court engaged in an extensive discussion with Lane regarding whether she could consider the existence of equally culpable defendants who did not receive the death penalty as a mitigating factor, and she ultimately stated that she could consider such evidence.  In this regard, the district court concluded as follows:

> It doesn't seem unreasonable, looking at this totally
> in the abstract, that equally culpable defendants would
> strike some people as not a very strong mitigating
> factor.  I think she ended up saying she would consider
> it.

Given that the district court had the opportunity to observe Lane's demeanor face-to-face, we decline to second-guess its determination that she was willing to give consideration to the existence of equally culpable defendants who would not receive

58

the death penalty as a mitigating factor and that she simply did not consider this to be an especially weighty consideration. The Eleventh Circuit addressed a similar circumstance in United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993). In that case, the government sought the death penalty pursuant to 21 U.S.C. § 848, which is substantially similar to the FDPA in terms of the procedure utilized in obtaining a sentencing recommendation from the jury. See Chandler, 996 F.2d at 1079. During voir dire of the jury venire, a venireperson stated that she "did not believe that the defendant's age and past criminal history would affect her recommendation for or against a death sentence." Id. at 1103. In holding that the district court did not abuse its discretion in nonetheless choosing not to strike the venireperson for cause, the court observed,

> [The venireperson's] answers do not raise the primary concern of Morgan; that is, a juror who would automatically recommend a penalty of death regardless of any mitigating evidence. The statement that she would not consider two of the statutory mitigating factors was made in response to defense counsel's questions and in ignorance of the mandates of § 848. Jurors are not expected to know the law prior to being properly instructed. More important, [the venireperson] stated that she would follow the district court's instructions in arriving at her decision. The district court thus did not abuse its discretion in finding that [the venireperson] would be able to follow the court's instructions.

Id. We likewise conclude that the district court did not abuse its discretion in failing to strike Lane for cause in spite of her initial statement that she could not consider the existence of equally culpable defendants who did not receive the death penalty as a mitigating factor.

59

### d.  Judith Dallinger

Hall claims that Judith Dallinger should have been struck for cause because she had been exposed to pretrial publicity regarding the murder and indicated on her juror questionnaire form that she had developed an opinion that "the defendant and his associates committed the crime."  During voir dire, Dallinger exhibited some equivocation regarding her ability to completely set aside the pretrial media coverage of the murder to which she had been exposed.  However, when questioned by the court, Dallinger indicated that, while she was not certain that she could completely forget what she had heard in the media about the crime, she could prevent that exposure from playing a role in her decision-making process.  She further agreed absolutely that the media could be unreliable and that a verdict must be based solely upon the evidence at the trial.  She further indicated that a year had passed since she had seen media coverage of the murder and that she could not remember the specifics of the crime or the names of the alleged perpetrators.  Based upon the entire record, the district court drew the following conclusions regarding Dallinger's fitness as a juror in response to Hall's challenge for cause:

> I overrule the objection, and I want to tell you mainly why.  I'm convinced that when she told me that she saw that as her job to put [her prior exposure to media coverage and her opinions] out of her mind for the purpose of making a decision, she saw that as her job and she would do it, I think that was the truest expression.  And I do think that given enough questioning any one of us would -- could be led to doubt that.

60

> I've got to make up my mind based on conflicting answers and use my own credibility assessments. Some I haven't felt this way about. This one I do. I think she would follow the law, and I think she would be able to disconnect herself from what she may have heard or seen about the case outside the courtroom. She said as much, and I believe her.

"A person is not automatically rendered unqualified to serve as a juror merely because he has been exposed to media coverage of the charged crime. The issue becomes whether exposure to media publicity will preclude the individual from returning a verdict based solely on the person's application of the law as stated to the evidence presented." Bell v. Lynaugh, 828 F.2d 1085, 1093 (5th Cir. 1987); see also Flores, 63 F.3d at 1357. We decline to second-guess the district court's determination, made after a face-to-face credibility assessment and thorough questioning, that Dallinger could faithfully follow the court's instructions and reach a verdict based solely upon the evidence presented at trial. See Bell, 828 F.2d at 1093 (holding that the trial court properly declined to strike a venireperson for cause where, "[w]hen asked whether [a] newspaper article [discussing the crime at issue in the trial] had influenced her, she stated 'I guess he is more guilty, if I have to choose [between guilty and not guilty,]' and 'I felt like he was guilty by the paper,'" but responded negatively when asked by defense counsel, "'Do you believe that based on what you have heard, or at least the impression that's left of what you have heard, which is natural, that that would, or could, affect some of your deliberations over issues of fact?'" (alterations in original)).

61

### e. Joyce McGough

Hall claims that Joyce McGough should have been struck for cause because (1) she demonstrated an extremely negative attitude toward life imprisonment without the possibility of parole and stated that she would not impose such a sentence unless the defense proved to her that it was appropriate, (2) she demonstrated discomfort with the notion of acquitting a defendant who was probably guilty even if she entertained a reasonable doubt about guilt, and (3) she could not consider evidence of a defendant's abusive childhood as mitigating. We disagree.

During the government's voir dire, McGough stated that, although she did not favor life imprisonment without the possibility of release as a potential sentence, she could nonetheless place her personal feelings regarding the sentence aside and consider it if instructed to do so by the court. She likewise unequivocally stated that, if she were instructed that she could return a guilty verdict only upon proof of guilt beyond a reasonable doubt, she would follow this instruction. McGough also noted that, when she previously served as a juror in a civil case, she was able to return a verdict that did not comport with her own beliefs regarding the fairness of the controlling rule of law but that was nonetheless dictated by the instructions given by the court. The district court also asked McGough whether she could consider the option of life imprisonment without possibility of release if instructed to do so without the interference of her personal feelings regarding the sentence, and

62

she responded unequivocally that she could.

As to mitigating factors, while McGough initially indicated that she did not consider the factors of equally culpable defendants who did not receive the death penalty or an abusive or dysfunctional family upbringing to be mitigating, upon further examination, she stated that she could in good faith follow the court's instructions and consider such factors as mitigating if instructed to do so.  Much like Lane, McGough's testimony indicates nothing more than that she did not consider these mitigating factors to be especially compelling; this fact did not render her an impartial juror.  See Eddings, 455 U.S. at 114-15; Chandler, 996 F.2d at 1103.  We therefore conclude that the district court did not abuse its discretion in concluding that McGough lacked any biases that would substantially impair her ability to fulfill her oath as a juror or follow the court's instructions.

### f.  Linda Faye Palmer

Hall claims that Linda Faye Palmer should have been struck for cause because she stated in her juror questionnaire, and reiterated during voir dire, that capital punishment was appropriate for "intentional murder and for repeat violent criminals," that she favored more frequent executions, and that she considered the lethal injection "too good/easy for people convicted of capital murder."  We find this argument unpersuasive.

During voir dire, Palmer stated that she would be able to

set aside her opinions regarding the death penalty and render a verdict based solely upon the evidence and the court's instructions. She also stated that she could give fair and honest consideration to mitigating factors in determining an appropriate sentence. The district court therefore did not abuse its discretion in concluding that Palmer possessed no biases that would substantially impair her ability to fulfill her oath as a juror and follow the court's instructions.

### g. Randal Davis

Hall claims that Randal Davis should have been struck for cause because (1) he stated in his juror questionnaire that he believed that the death penalty was an appropriate punishment for several non-homicide offenses and was appropriate for all kidnappings resulting in death and (2) he indicated during voir dire that he would have difficulty giving mitigating weight to the existence of equally culpable defendants who did not receive the death penalty. However, we conclude that the record evinces no abuse of discretion on the part of the district court in declining to strike Davis for cause.

Davis assured the court during voir dire that he could follow its instructions and "fairly and sincerely in good faith consider the aggravating factors and weigh those against the mitigating factors and decide whether the aggravating factors were sufficient to justify a sentence of death." Further, Davis expressly stated that he could give "good faith, adult consideration" to the mitigating factor of the existence of

64

equally culpable defendants who did not receive the death penalty and that he would consider the factor important.  We therefore conclude that the district court did not abuse its discretion in concluding that Davis was not substantially impaired in his ability to follow the court's instructions and fulfill his oath as a juror.

Because we have concluded that the district court did not abuse its discretion in declining to strike the venirepersons of whom Hall now complains for cause, the district court did not abridge Hall's statutory right to free exercise of his peremptory challenges.  We therefore necessarily reject Hall's claim that the district court violated his right to due process by arbitrarily abridging his right to free exercise of his peremptory challenges.

### G.  Jurors' Failure to Find Abusive Childhood as a Mitigating Factor

Hall next complains of the fact that only one of the twelve jurors found the circumstances surrounding his upbringing to be a mitigating factor.  He contends that the conclusion of the remaining eleven jurors that the circumstances surrounding his upbringing did not constitute a factor militating against a death sentence was clearly erroneous.  In support of this contention, he notes that his mother, Betty Hall, and his older sister, Cassandra Hall, offered uncontroverted testimony that Hall's father, A.J. Hall, beat Hall's mother throughout their marriage, which ended in divorce when Hall was fifteen.

As an initial matter, we question whether the jurors'

failure to find a particular mitigating factor constitutes a proper subject of review for this court. The district court in this case submitted to the jury a special verdict form whereby they recorded the number of jurors who found each of the listed mitigating factors. However, this procedure is not required by the FDPA. Section 3593(d) provides that the jury "shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and any other aggravating factor for which notice has been provided under subsection (a) found to exist." 18 U.S.C. § 3593(d). However, the statute does <u>not</u> require the jury to return special findings regarding which mitigating factors the jury found to exist or the number of jurors who found that a particular mitigating factor existed. <u>See</u> <u>id.</u>

Assuming, <u>arguendo</u>, that we possess the authority to review the jurors' special findings regarding mitigating factors, we must accept the jurors' factual determinations unless no reasonable juror could have arrived at the conclusion reached by the juror in question. <u>Cf.</u> <u>United States v. Robichaux</u>, 995 F.2d 565, 569 (5th Cir. 1993) (noting that, in evaluating a claim that a jury's guilty verdict in a criminal trial is supported by insufficient evidence, the court "inquires whether a reasonable juror could find the evidence establishes guilt beyond a reasonable doubt" (internal quotation marks omitted)). "[D]etermining the weight and credibility of the evidence is within the sole province of the jury." <u>United States v. Garza</u>,

66

990 F.2d 171, 173 (5th Cir. 1993) (internal quotation marks omitted); see also United States v. Kelley, 140 F.3d 596, 607 (5th Cir. 1998).

In support of his claim that he experienced an upbringing that militated against the imposition of the death penalty, Hall offered only the testimony of two of his family members, which the jury was free to believe or disbelieve. Additionally, this testimony indicated that Hall was not himself the object of his father's abuse and that, throughout his childhood, Hall attended school and church and was properly housed, fed, and clothed. We cannot conclude that no reasonable juror could conclude that Hall failed to establish by a preponderance of the evidence that he experienced a childhood that rendered him in some degree less deserving of the death penalty than he might otherwise be.

## H. Constitutionality of Aggravating Factors

Hall contends that several of the statutory and nonstatutory aggravating factors that the district court submitted to the jury to evaluate in determining whether to recommend a death sentence were unconstitutionally vague, overbroad, or duplicative. Specifically, Hall challenges the following factors:

(1)  the statutory aggravating factor that "the defendant committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim," set forth in 18 U.S.C. § 3592(c)(6);

(2)  the statutory aggravating factor that the death

occurred during the commission of another offense, set forth in § 3592(c)(1); and

(3)  the nonstatutory aggravating factor of "the effect of the instant offense on the family of Lisa Rene."

We consider each of these arguments in turn.

### 1.  Offense Committed in an Especially Heinous, Cruel, or Depraved Manner

During the penalty phase, one of the aggravating factors about which the district court instructed the jury was that Hall "committed the offense in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse of the victim, Lisa Rene."  This statutory factor was accompanied by the following instruction:

> To establish that the defendant killed the victim in an especially heinous, cruel, or depraved manner, the government must prove that the killing involved either torture or serious physical abuse to the victim. The terms "heinous, cruel, or depraved" are stated in the disjunctive:  any one of them individually may constitute an aggravating circumstance warranting imposition of the death penalty.  "Heinous" means extremely wicked or shockingly evil, where the killing was accompanied by such additional acts of torture or serious physical abuse of the victim as set apart from other killings.  "Cruel" means that the defendant intended to inflict pain upon the victim in addition to killing the victim. "Depraved" means that the defendant relished the killing or showed indifference to the suffering of the victim, as evidenced by torture or serious physical abuse of the victim.

> "Torture" includes mental as well as physical abuse of the victim.  In either case, the victim must have been conscious of the abuse at the time it was inflicted.  Furthermore, the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim.  "Serious physical abuse" means a

68

significant or considerable amount of injury or damage to the victim's body which involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty. Serious physical abuse--unlike torture--may be inflicted either before or after death and does not require that the victim be conscious of the abuse at the time it was inflicted. However, the defendant must have specifically intended the abuse apart from the killing.

Pertinent factors in determining whether a killing was especially heinous, cruel, or depraved include, but are not necessarily limited to, the following: infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing; needless mutilation of the victim's body; senselessness of the killing; and helplessness of the victim. The word "especially" should be given its ordinary, everyday meaning of being highly or unusually great, distinctive, peculiar, particular, or significant.

Hall contends that the "especially heinous, cruel, or depraved" aggravating factor is unconstitutionally vague, overbroad, and improperly allowed the jury to consider the conduct of his coconspirators in determining whether to impose the death penalty. We disagree.

First, Hall's vagueness challenge is foreclosed by United States v. Jones, 132 F.3d 232 (5th Cir. 1998). In that case, this court held that a § 3592(c)(6) aggravating factor and accompanying instruction virtually identical to that at issue here was not unconstitutionally vague. See id. at 249-50. We are therefore compelled by principles of intra-circuit stare decisis to conclude that the instruction in this case is not unconstitutionally vague. See United States v. Garcia Abrego, 141 F.3d 142, 151 n.1 (5th Cir. 1998) ("It has long been a rule of this court that no panel of this circuit can overrule a

69

decision previously made by another." (internal quotation marks omitted)).

Hall next claims that the instructions accompanying this aggravating factor rendered it unconstitutionally overbroad. Specifically, Hall complains that the district court's definition of "serious physical abuse" would allow the jury to conclude that the killing was committed in an "especially heinous, cruel, or depraved" manner based solely upon the fact that Hall killed Lisa Rene. Hall bases this argument upon the fact that the district court defined "serious physical abuse" to include "a significant or considerable amount of injury or damage to the victim's body, which involves a substantial risk of death," a definition that includes any killing.

Hall's argument ignores the remainder of the instruction, which makes clear that "serious physical injury" contemplates something more than an amount of injury necessary to cause death. Specifically, the instruction provides that, in order for a killing to be especially heinous, cruel, or depraved on the basis of an infliction of physical abuse, "the defendant must have specifically intended the abuse apart from the killing." Further, the instruction lists a number of factors for the jury to consider in determining whether the offense was especially heinous, cruel, or depraved, including "infliction of gratuitous violence upon the victim above and beyond that necessary to commit the killing" and "needless mutilation of the victim's body."

70

Hall also argues that the definition of "serious physical abuse" was suspect because it allowed the jury to consider conduct that occurred after Lisa Rene lost consciousness. However, we see no reason why the jury should have been precluded from considering such conduct because it constituted evidence that the killing was committed in a depraved manner in that it provides an indication that Hall "relished the killing." Cf. Jones v. Murray, 947 F.2d 1106, 1118 (4th Cir. 1991) (holding that the Virginia Supreme Court had adopted a constitutionally limited construction of "vileness" as an aggravating factor where the state court had held that vileness was evinced by "an aggravated battery such as mutilation, gross disfigurement, or sexual assault committed upon a corpse or an unconscious body"). We therefore conclude that Hall has failed to establish that the district court's instructions regarding the "especially heinous, cruel, or depraved" aggravating factor rendered that factor unconstitutionally overbroad.

Finally, Hall claims that the district court's instructions invited the jury to consider the conduct of Hall's coconspirators throughout the course of the kidnapping in concluding that the killing was "especially heinous, cruel, or depraved." However, the wording of the aggravating factor itself focuses upon the actions of Hall; it provides that the jury must conclude that "the defendant committed the offense in an especially heinous, cruel, or depraved manner." The instructions accompanying the aggravating factor removed any doubt that the jury was required

71

to focus on Hall's actions in determining whether this aggravating factor existed.  Specifically, the instructions provide that, in order for the killing to have involved torture, "the defendant must have specifically intended to inflict severe mental or physical pain or suffering upon the victim, apart from killing the victim."  Similarly, the instructions provide that, in order for the killing to have involved serious physical abuse, "the defendant must have specifically intended the abuse apart from the killing."

Hall finally argues that the "especially heinous, cruel, or depraved" aggravating factor was unconstitutionally duplicative of the factor that the death occurred during the course of a kidnapping.  As the government points out, however, the fact that the murder occurred during the course of a kidnapping does not of itself indicate that the murder was "especially heinous, cruel, or depraved."  Likewise, a murder not committed in the course of a kidnapping may be "especially heinous, cruel, or depraved." Moreover, the fact that Hall raped Lisa Rene prior to killing her was unnecessary to the jury's conclusion that the death occurred during the course of the kidnapping, but was clearly germane to the determination that Hall committed the offense in an especially heinous, cruel, or depraved manner.  Hall has therefore failed to demonstrate any constitutional infirmity in the "especially heinous, cruel, or depraved" statutory aggravating factor.

## 2. Death During the Course of Another Offense

Hall claims that the statutory aggravating factor that the death occurred during the commission of another offense, set forth in § 3592(c)(1), did not narrow the jury's discretion. We disagree.

In <u>Lowenfield v. Phelps</u>, 484 U.S. 231 (1988), the petitioner was found guilty of capital murder on the basis of a Louisiana statute that defined capital murder to include scenarios in which "'the offender has a specific intent to kill or inflict great bodily harm upon more than one person.'" Id. at 242-43 (quoting LA. REV. STAT. ANN. § 14:30A(3) (West 1986)). The Louisiana Code of Criminal Procedure provided that "'[a] sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be imposed.'" Id. at 242 (quoting LA. CODE CRIM. PROC. ANN. art. 905.3 (West 1984)). The sole statutory aggravating factor found by the jury and upheld by the Louisiana Supreme Court on direct review was that "'the offender knowingly created a risk of death or great bodily harm to more than one person.'" Id. at 243 (quoting LA. CODE CRIM PROC. ANN. art. 905.4(d) (West 1984)). The petitioner claimed that his death sentence was unconstitutional because the aggravating factor justifying its imposition did not narrow the class of persons eligible for the death penalty in that the statutory aggravating factor required proof of nothing more than that the defendant had

73

committed capital murder.  The supreme court rejected this

argument:

> The use of "aggravating circumstances" is not an
> end in itself, but a means of genuinely narrowing the
> class of death-eligible persons and thereby channeling
> the jury's discretion.  We see no reason why this
> narrowing function may not be performed by jury
> findings at either the sentencing phase of the trial or
> the guilt phase.
>
> . . .
>
> Here, the "narrowing function" was performed by
> the jury at the guilt phase when it found defendant
> guilty of three counts of murder under the provision
> that "the offender has a specific intent to kill or to
> inflict great bodily harm upon more than one person."
> The fact that the sentencing jury is also required to
> find the existence of an aggravating circumstance in
> addition is no part of the constitutionally required
> narrowing process, and so the fact that the aggravating
> circumstance duplicated one of the elements of the
> crime does not make this sentence constitutionally
> infirm.  There is no question but that the Louisiana
> scheme narrows the class of death-eligible murderers
> and then at the sentencing phase allows for the
> consideration of mitigating circumstances and the
> exercise of discretion.  The Constitution requires no
> more.

Id. at 244-46.

Hall attempts to distinguish Lowenfield on the ground that

Louisiana defined capital murder narrowly enough that the

defendant was rendered death-eligible based solely upon his

conviction.  He notes that, in finding the petitioner guilty of

capital murder, the jury in that case found that the petitioner

killed more than one person with the specific intent to do so,

and this circumstance alone was sufficient to render him eligible

for the death penalty.  Hall notes that conviction of the capital

offense established by 18 U.S.C. § 1201 requires nothing more

74

than proof beyond a reasonable doubt that the defendant committed a kidnapping in which "the death of any person result[ed]," regardless of the mental state of the defendant with respect to the death. He thus notes that conviction under § 1201 does not of itself render a defendant eligible for the death penalty. See Enmund v. Florida, 458 U.S. 782, 797 (1982) (holding that the Eighth Amendment does not permit imposition of the death penalty on a defendant "who aids and abets a felony in the course of which murder is committed by others but who does not himself kill, attempt to kill, or intend that killing take place or that lethal force will be employed").

While we agree with Hall that his conviction for violation of § 1201 did not, of itself, render him death-eligible, this fact does not render the aggravating factor that the death occurred during the course of a kidnapping constitutionally infirm. During the penalty phase, before it could consider this aggravating factor or any other, the jury was required to find beyond a reasonable doubt that Hall

> (A) intentionally killed [Lisa Rene];
> (B) intentionally inflicted serious bodily injury that resulted in the death of [Lisa Rene];
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and [Lisa Rene] died as a direct result of the act; or
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and [Lisa Rene] died as a direct result of the act.

75

18 U.S.C. § 3591(a)(2).  Hall does not contend (nor can he) that he was not constitutionally eligible for the death penalty upon proof beyond a reasonable doubt that he committed a kidnapping during which death resulted and that, as to the death, Hall acted with one of the mental states listed above.  See Tison v. Arizona, 481 U.S. 137, 158 (1987) (holding "that major participation in [a] felony committed, combined with reckless indifference to human life, is sufficient to satisfy the [Eighth Amendment's] culpability requirement" regarding offenses that may be punishable by death).  The fact that the jury was not required to find that Hall acted with a sufficiently culpable mental state to render him eligible for the death penalty until the penalty phase provides no material basis for distinguishing the aggravating factor at issue here from the one at issue in Lowenfield.  "There is no question but that the [FDPA] narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion.  The Constitution requires no more."  Lowenfield, 484 U.S. at 246; see also Jones, 132 F.3d at 249 (holding that an aggravating factor based upon 18 U.S.C. § 3592(c)(1) was not unconstitutional).[16]

---

[16]  Hall also argues that this case is distinguishable from Lowenfield on the ground that, under Louisiana's death penalty framework, the jury is not required to weigh mitigating factors against aggravating factors.  He argues that, under a weighing framework such as the FDPA, allowing the jury to consider the mere circumstance that established the basis of his conviction as an aggravating factor "would unfairly skew the weighing process in favor of death."  United States v. McVeigh, 944 F. Supp. 1478, 1489-90 (D. Colo. 1996).  In support of this proposition, Hall

### 3. Effect on Lisa Rene's Family

Hall next argues that the nonstatutory aggravating factor of "the effect of the instant offense on Lisa Rene's family" was unconstitutionally overbroad and vague and that it was unauthorized by the FDPA.  We need not reach this issue because we conclude that any error in submitting this aggravating factor to the jury was harmless.

---

relies upon the following language from Stringer v. Black, 503 U.S. 222, 231-32 (1992):

> With respect to the function of a state reviewing court in determining whether the sentence can be upheld despite the use of an improper aggravating factor, the difference between a weighing State and a nonweighing State is not one of "semantics," . . . but of critical importance.  In a nonweighing State, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty.  Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation resulting from the introduction of the invalid factor in an earlier stage of the proceedings.  But when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.

Id. at 231-32.  Hall's reliance upon this language, of course, begs the question of whether the fact that the death occurred during the course of a kidnapping is an "invalid factor."  As indicated supra, we have concluded that the fact that the death was intentionally committed during the course of a kidnapping is a factor that may justify imposition of the death penalty.  We likewise conclude that it is a factor that the jury may properly weigh against mitigating factors in determining whether the death penalty constitutes an appropriate punishment in a particular case.

77

The FDPA provides that, in reviewing a death sentence imposed pursuant to the act, "[t]he court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless."  18 U.S.C. § 3595(c)(2).  Under a death penalty framework pursuant to which the sentencer weighs aggravating factors against mitigating factors in determining whether death constitutes the appropriate sentence, the consideration of a constitutionally infirm aggravating factor constitutes harmless error if, beyond a reasonable doubt, the sentence would have been the same had the sentencer never considered the invalid aggravating factor.  See Clemons v. Mississippi, 494 U.S. 738, 753 (1990) (noting that whether "beyond a reasonable doubt . . . the jury's verdict would have been the same with or without the [constitutionally infirm] aggravating circumstance" constituted an appropriate harmless-error inquiry when evaluating the submission of an improper aggravating factor under a weighing framework); Wiley v. Puckett, 969 F.2d 86, 91 (5th Cir. 1992) (indicating that, in conducting a harmless-error analysis of the submission of an improper aggravating factor under a weighing framework, a "court [may] ask whether beyond a reasonable doubt the sentence would have been the same had the vague aggravating circumstance not been injected into the mix, or the court [may] ask whether beyond a reasonable doubt the sentence would have been the same had the circumstance

been properly defined in the jury instructions").

Assuming that the nonstatutory aggravating factor of the effect of the instant offense on Lisa Rene's family was unconstitutionally overbroad or vague or that it was unauthorized by the FDPA, we conclude that the district court's error in submitting it to the jury was harmless.  In addition to its determination that the effect of the offense on Lisa Rene's family constituted an aggravating factor, the jury also unanimously found the following aggravating factors:  (1) that Hall intentionally killed Lisa Rene during the course of a kidnapping; (2) that he killed Lisa Rene in an especially heinous, cruel, or depraved manner; and (3) that Hall constitutes a future danger to the lives and safety of other persons.  During the trial, the jury heard extensive evidence indicating that, during the course of the kidnapping, Hall and his coconspirators raped Lisa Rene, kept her tied up in a motel room for two days, forced her on two occasions to walk barefooted and masked through the woods to the site of her murder, brutally beat her into unconsciousness with a shovel, and buried her in a grave where she suffocated.  Weighing against these facts and the aggravating factors that they prompted the jury to find unanimously were four mitigating factors:  (1) "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death"; (2) "[t]he age of the defendant at the time of the offense"; (3) "[t]he circumstances surrounding the defendant's upbringing"; and (4) "[a]ny other aspect of the defendant's character or

background which calls for a sentence less than death." Of these mitigating factors, only the first was found by more than one juror. Given the atrociousness of this crime and the relative paucity of mitigating factors, we have little difficulty concluding beyond a reasonable doubt that the jury would have returned a recommendation that Hall receive a death sentence regardless of whether it had considered the aggravating factor of the effect of the offense on Lisa Rene's family.

This conclusion is bolstered by this court's recent decision in Jones, 132 F.3d at 232. In that case, the court concluded that two of the four aggravating factors found by the jury--"[the victim's] personal characteristics and the effect of the instant offense on [her] family" and "[the victim's] young age, her slight stature, her background, and her unfamiliarity with [the area where the murder took place]"--were unconstitutionally vague, overbroad, and duplicative. Id. at 250-51. This left two valid aggravating factors substantially similar to two of the factors that the jury found unanimously in this case and that we have previously held pass constitutional muster: "[t]he defendant . . . caused the death of [the victim], or injury resulting in the death of [the victim], which occurred during the commission of the offense of Kidnapping" and "[t]he defendant . . . committed the offense in an especially heinous, cruel, and depraved manner in that it involved torture or serious physical abuse to [the victim]." Id. at 248-50. Weighing against these aggravating factors were ten mitigating factors, many of which

80

were found by more than one juror.[17]  The court concluded beyond

a reasonable doubt that the jury would have returned a

recommendation of death even if it had not considered the two

invalid aggravating factors.  See id. at 252.  Our harmless-error

analysis in this case leads us to the same conclusion.

---

[17]  The mitigating factors found by at least one juror in
Jones included the following:

> (1) the defendant . . . did not have a significant
> prior criminal record [found by six jurors];
> (2) the defendant's capacity to appreciate the
> wrongfulness of the defendant's conduct or to conform
> to the requirements of the law was significantly
> impaired, regardless of whether the capacity was so
> impaired as to constitute a defense to the charge
> [found by two jurors];
> (3) the defendant committed the offense under severe
> mental or emotional disturbance [found by one juror];
> (4) the defendant was subjected to physical, sexual,
> and emotional abuse as a child (and was deprived of
> sufficient parental protection that he needed) [found
> by four jurors];
> (5) the defendant served his country well in Desert
> Storm, Grenada, and for 22 years in the United States
> Army [found by eight jurors];
> (6) the defendant is likely to be a well-behaved
> inmate [found by three jurors];
> (7) the defendant is remorseful for the crime he
> committed [found by four jurors];
> (8) the defendant's daughter will be harmed by the
> emotional trauma of her father's execution [found by
> nine jurors];
> (9) the defendant was under unusual and substantial
> internally generated duress and stress at the time of
> the offense [found by three jurors];
> (10) the defendant suffered from numerous
> neurological or psychological disorders at the time of
> the offense [found by one juror].

Jones, 132 F.3d at 238 n.3

81

# I.  Denial of Continuance

Hall claims that the district court denied him his rights to
due process and the effective assistance of counsel under the
Fifth and Sixth Amendments by denying his motion for a
continuance to allow his counsel an additional thirty days to
prepare for trial.  Proper evaluation of this claim requires the
construction of a brief chronology of events that transpired from
the time of the issuance of the complaint in this case to the
time of trial.

A federal complaint in this matter issued against Hall on
October 26, 1994, and Hall was appointed counsel two days later.
The district court initially set the trial of Hall and his
codefendants for January 3, 1995.  A superseding indictment
containing capital charges was returned on November 22, 1994, and
Hall entered a not guilty plea to the superseding indictment on
November 28, 1994.  On December 8, 1994, Hall filed a motion for
a continuance, which the district court granted without setting a
new trial date.

On January 6, 1995, the district court held a status
conference at which the government indicated that it would likely
seek the death penalty against Hall.  The court also indicated a
preliminary trial date of July 17, 1995.  On February 23, 1995,
the government filed its notice of intent to seek the death
penalty against Hall.

On March 9, 1995, the district court granted a sealed motion
by Hall's appointed counsel to withdraw from the case.  On March

15, 1995, the district court entered an amended scheduling order setting Hall's trial for July 17, 1995.  On March 21, 1995, the district court appointed new counsel, Jeffrey Kearney and Michael Logan Ware, to represent Hall.  On April 6, 1995, the district court granted Hall's motion for severance from the trial of his codefendants and entered a second amended scheduling order resetting Hall's trial for October 2, 1995.

On August 2, 1995, Hall filed a motion for a continuance requesting an additional thirty days for trial preparation on the ground that one of his attorneys, Jeffrey Kearney, was scheduled for several trials prior to Hall's October trial date.  The district court denied the motion on August 10, 1995.  Hall unsuccessfully reurged his motion for a continuance immediately prior to jury selection and twice during the penalty phase.  The district court allowed Hall to proceed with jury selection with one attorney present while the other continued to prepare for trial.

We review a district court's denial of a motion for a continuance for an abuse of discretion.  See United States v. Davis, 61 F.3d 291, 298 (5th Cir. 1995).  A district court's denial of a continuance will warrant reversal only upon a showing that the denial caused the defendant to "suffer[] serious prejudice."  United States v. Dupre, 117 F.3d 810, 823 (5th Cir. 1997), cert. denied, 118 S. Ct. 857 (1998); see also United States v. Scott, 48 F.3d 1389, 1393 (5th Cir. 1995); United States v. Castro, 15 F.3d 417, 423 (5th Cir. 1994).

83

In determining whether to grant a continuance, the district court should examine

> (1) the amount of preparation time available, (2) whether the defendant took advantage of the time available, (3) the likelihood of prejudice from a denial, (4) the availability of discovery from the prosecution, and (5) the complexity of the case.

Scott, 48 F.3d at 1393.

In this case, the district court did not abuse its discretion in concluding that a thirty-day continuance for trial preparation was not warranted. First, Hall's second team of attorneys had over six months in which to prepare for trial. Second, while we acknowledge that the FDPA creates a somewhat complex procedural framework and is of fairly recent vintage, our review of the record provides no indication that this was a case of exceptional complexity, particularly given that Hall put on no evidence at the guilt phase of his trial and focused solely on the penalty phase. Third, while Hall claims that the government's discovery in the case was voluminous, he makes no contention that open and complete discovery was not forthcoming. Fourth, the district court could properly conclude that prejudice was unlikely to result from denial of the continuance, given that Hall's motion for a continuance indicated no scheduling conflicts on the part of Michael Logan Ware, Hall's other appointed counsel. Further, while Hall's motion for a continuance stated that his counsel lacked adequate time to investigate the case given that many potential witnesses were in Arkansas, on appeal, he merely makes a general claim that the refusal to grant the

84

continuance denied him due process and the effective assistance of counsel.  Hall's only specific allegation of prejudice resulting from the denial of the continuance is the fact that only one of his appointed counsel was present during the majority of jury selection.  However, our review of the record reveals no deficiency in the representation that Hall received during this stage of the trial.  We therefore conclude that the district court's denial of Hall's motion for a continuance provides no basis for reversing the district court's judgment of conviction and sentence.

### J.  Failure to Poll the Jury Regarding Mid-Trial News Broadcast

Hall claims that the district court abused its discretion in declining to poll the jury regarding their possible exposure to a television news broadcast during their deliberations in the penalty phase of Hall's trial.  The jury began deliberations in the penalty phase on Friday, November 3, 1995.  That evening, the district court released the jury for the weekend, and deliberations resumed the following Monday.  After the jury returned to its deliberations on Monday, November 6, 1995, Hall moved the district court to either poll the jury or declare a mistrial on the basis of a news broadcast aired on a local station the night before.  The broadcast, in its entirety approximately three minutes in length, consisted of a thirty-second segment stating merely that the jury had found Hall guilty but had not yet completed deliberations regarding punishment followed by a brief debate between commentators regarding the

85

appropriateness of the death penalty in cases of rape.  After

viewing a videotape of the broadcast, the district court denied

both of Hall's motions.

We review a district court's decision not to conduct a voir

dire of the jury regarding their possible exposure to mid-trial

publicity for an abuse of discretion.  See United States v.

Rasco, 123 F.3d 222, 230 (5th Cir. 1997) ("'It is for the trial

judge to decide at the threshold whether news accounts are

actually prejudicial; whether the jurors were probably exposed to

the publicity; and whether the jurors would be sufficiently

influenced by bench instructions alone to disregard the

publicity.'"  (quoting Gordon v. United States, 438 F.2d 858, 873

(5th Cir. 1971))), cert. denied, 118 S. Ct. 868 (1998).  In

United States v. Herring, 568 F.2d 1099 (5th Cir. 1978), this

court held that the district court should grant a voir dire of

the jury on the basis of mid-trial publicity if "serious

questions of possible prejudice" exist.  Id. at 1104.  The court

went on to hold that the determination of whether such questions

exist requires a two-part inquiry:

> A court must first look at the nature of the news
> material in question to determine whether it is
> innately prejudicial; factors such as the timing of the
> media coverage and its possible effects on legal
> defenses are to be considered.  . . .  Second, the
> court must ascertain the likelihood that the publicity
> has in fact reached the jury.  The prominence of the
> media coverage and the nature and number of warnings
> against viewing the coverage become relevant at this
> stage of the inquiry.

United States v. Manzella, 782 F.2d 533, 542 (5th Cir. 1986)

(citing Herring, 568 F.2d at 1104-05).

In this case, we conclude that the district court did not abuse its discretion in declining to voir dire the jury regarding their possible exposure to the news broadcast.  The portion of the broadcast directly related to Hall's trial did little more than recount the procedural posture of the case, and thus was not in any sense innately prejudicial.  See United States v. Martinez-Moncivais, 14 F.3d 1030, 1037 (5th Cir. 1994) (finding that publicity carried no potential for prejudice because "the news media had merely publicized an issue that the jurors had already been informed of by the judge himself").  The second segment of the broadcast was potentially more prejudicial.  However, the district court could properly conclude that the likelihood that the jury was exposed to this portion of the broadcast was so remote that voir dire was not warranted.

Throughout the guilt phase of Hall's trial, the district court repeatedly admonished the jury to avoid media coverage of the trial, and it reemphasized these instructions during the penalty phase.  It also provided the jurors with redacted newspapers.  Moreover, prior to releasing the jury for the weekend during its penalty-phase deliberations, the court again gave the jurors a stern warning regarding the avoidance of media coverage:  "[T]here will be media coverage, and you'll have to be very vigilant to avoid newspapers and television and radio, news coverage . . . ."  Given the court's admonition, it is unlikely that any of the jurors saw any portion of the broadcast in question.  Moreover, any juror who happened to see the beginning

of the broadcast likely would have, pursuant to the court's instructions, turned off the television before the prejudicial portion of the broadcast commenced. In sum, we conclude that the district court did not abuse its discretion in concluding that the likelihood that the jury was exposed to the prejudicial portion of the broadcast was sufficiently low that voir dire of the jury was not warranted. See United States v. Bermea, 30 F.3d 1539, 1559 (5th Cir. 1994) (noting that "[an] approach [that this court has] favored [in reducing the likelihood of the jury's exposure to prejudicial extrinsic information] is the giving of a blanket instruction to the jury not to view or listen to any radio or television news broadcasts or to read any newspapers except as provided by the court, and then to provide newspapers with any relevant portions redacted from them").

### K. Admissibility of Hall's Custodial Statement

Hall contends that the district court erred in denying his motion to suppress a custodial statement that he made to state and local law enforcement officials subsequent to his arrest. He argues that admission of the statement violated his Fifth and Sixth Amendment rights as well as 18 U.S.C. § 3501. Full review of these claims requires an overview of the facts surrounding Hall's arrest and subsequent detention as they were developed during the suppression hearing held by the district court.

### 1. Factual Background

On September 29, 1994, a Texas court issued a warrant for the arrest of Hall and two of his coconspirators for the

88

aggravated kidnapping of Lisa Rene.  That same date, a federal criminal complaint and arrest warrant were issued charging Hall with flight to avoid prosecution on the Texas charges in violation of 18 U.S.C. § 1073.

On September 30, 1994, Hall, accompanied by retained counsel, surrendered to law enforcement authorities in El Dorado, Arkansas.  Hall was taken before an Arkansas magistrate, who made a determination that probable cause existed to hold Hall on the Texas charges.  Hall waived extradition and agreed to return to Texas to face the state aggravated kidnapping charges.

That same day, Hall spoke with Special Agent Garrett Floyd of the Federal Bureau of Investigation and Detective Jim Ford of the Arlington Police Department in the presence of his retained counsel.  Before speaking with Hall, Ford read Hall his Miranda[18] rights.  Floyd testified at the suppression hearing that Hall told Ford and Floyd that he wished to talk to them in Texas. Floyd also testified that as he, Ford, and Hall's retained counsel left the room, Hall told Floyd, "It wasn't supposed to be that way.  I'll talk to you about it when I get to Texas."  Floyd also testified that after he escorted Hall back to the holding facility at the jail, Hall stated, "I'll tell you all about it when I get to Texas.  Come and see me."

Hall was transported to Texas on October 4, 1994.  On October 5, 1994, he was arraigned on the state kidnapping charge before a Texas municipal court judge.  That afternoon, Ford and

---

[18]  See Miranda v. Arizona, 384 U.S. 436 (1966).

Floyd came to the Arlington jail, where Hall was being detained, to interview him.  Floyd testified that, when they arrived, Hall asked what had taken them so long to come see him.  Floyd and Ford read Hall his Miranda rights, secured a written waiver, and interviewed him for approximately six hours, during which time Hall made incriminating statements both orally and in writing.  On October 28, 1994, after the federal complaint in this matter was returned, Hall was formally arraigned before a federal magistrate judge.

## 2.  Constitutional Claims

Hall first claims that his custodial statement to Floyd and Ford was inadmissible as substantive evidence against him at his trial because Floyd and Ford took the statement in violation of his Fifth and Sixth Amendment rights to counsel.  We disagree.

In Edwards v. Arizona, 451 U.S. 477 (1981), the Supreme Court held that, once the accused asserts his Fifth Amendment right to counsel and thereby "expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  Id. at 484-85.  In Arizona v. Roberson, 486 U.S. 675 (1988), the Court made clear that the Edwards rule is not offense specific. See id. at  682-84; see also McNeil v. Wisconsin, 501 U.S. 171, 177 (1991); United States v. Carpenter, 963 F.2d 736, 739 (5th Cir. 1992).  Once a suspect invokes his Fifth Amendment right to

90

counsel with respect to one offense, law enforcement officials may not reapproach him regarding any offense unless counsel is present. See McNeil, 501 U.S. at 177; Roberson, 486 U.S. at 682-84, 687; Carpenter, 963 F.2d at 739; United States v. Cooper, 949 F.2d 737, 741 (5th Cir. 1991).

In Michigan v. Jackson, 475 U.S. 625 (1986), the Supreme Court held that the Edwards prophylactic rule applies when a defendant invokes his Sixth Amendment right to counsel at an arraignment and law enforcement officials subsequently initiate custodial interrogation of the defendant prior to providing him an opportunity to consult with counsel. See id. at 636 ("Edwards is grounded in the understanding that the assertion of the right to counsel is a significant event and that additional safeguards are necessary when the accused asks for counsel. We conclude that the assertion is no less significant, and the need for additional safeguards no less clear, when the request for counsel is made at an arraignment and when the basis for the claim is the Sixth Amendment. We thus hold that, if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." (internal quotation marks and alterations omitted)).

Unlike the Fifth Amendment right to counsel, the Sixth Amendment right is offense specific; an invocation of the Sixth Amendment right to counsel applies only with respect to the

charged offense as to which it is invoked.  See McNeil, 501 U.S. at 177.  Thus, Roberson's extension of Edwards's preclusion of police-initiated interrogation after the defendant's invocation of his Fifth Amendment right to counsel does not apply to an invocation of the defendant's Sixth Amendment right to counsel. A limited exception to this rule exists, however.  If an uncharged offense is "extremely closely related" to or "inextricably intertwined" with a charged offense, a defendant's invocation of his Sixth Amendment right to counsel with respect to the charged offense will also preclude further custodial interrogation regarding that uncharged offense.  Carpenter, 963 F.2d at 740; see also Cooper, 949 F.2d at 743.  We have held that this is true even when the uncharged offense in question is a federal offense and the charged offense is a state offense.  See United States v. Laury, 49 F.3d 145, 150 & n.11 (5th Cir. 1995) ("In this case, the federal charges and state charges were identical, and therefore the invocation of the Sixth Amendment right on the state charges was sufficient to invoke the right on the federal charges.").

We accept, merely for the sake of argument, the highly dubious assumption that, by surrendering to law enforcement officials in the presence of counsel, Hall unequivocally invoked his Fifth Amendment right to counsel.  We likewise assume that, at the point of his surrender, Hall had also invoked his Sixth Amendment right to counsel with respect to the Texas aggravated kidnapping charge and that this charge was so inextricably

intertwined with the federal charges of which the jury convicted Hall in this case that the invocation of his Sixth Amendment right to counsel as to the Texas charge precluded law enforcement officials from later initiating interrogation regarding the federal charges. Accepting all of these assumptions, we believe that the district court correctly concluded that Hall reinitiated the interrogation that led to his custodial statement. As noted earlier, Agent Floyd testified that, in Arkansas, Hall told him that he wished to speak with law enforcement officials once he got to Texas and that, once Floyd and Ford arrived at the Arlington jail to interview Hall, Hall asked him what had taken them so long to get there. From this testimony, the district court could properly conclude that Hall, rather than Ford or Floyd, initiated the interrogation at the Arlington jail. As such, Hall's custodial statements did not violate the prophylactic rules designed to safeguard Fifth and Sixth Amendment rights. See Edwards, 451 U.S. at 484-85 (holding that, once the accused asserts his Fifth Amendment right to counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" (emphasis added)); Mann v. Scott, 41 F.3d 968, 975-76 (5th Cir. 1994) (holding that the defendant's custodial statement was not rendered inadmissible based upon the fact that he had invoked his Sixth Amendment right to counsel prior to making the statement because the defendant had initiated

93

the conversation with law enforcement officials that resulted in the statement).

### 3. Section 3501 Claim

Hall next argues that his custodial statement was inadmissible under 18 U.S.C. § 3501(b) and (c).  First, he argues that his confession was involuntary under the criteria set forth in § 3501(b).  Second, he argues that § 3501(c) renders his confession inadmissible because he was not brought before a federal magistrate judge until twenty-eight days after he was initially taken into custody by Arkansas law enforcement authorities.  We consider each of these arguments in turn.

A confession is voluntary if, "under the 'totality of the circumstances,' the statement is the product of the accused's 'free and rational choice.'"  United States v. Doucette, 979 F.2d 1042, 1045 (5th Cir. 1992) (quoting United States v. Rogers, 906 F.2d 189, 190 (5th Cir. 1990)).  Section 3501(b) provides that the trial judge should consider the following factors, among others, in determining whether a defendant voluntarily gave a confession:

> (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

94

18 U.S.C. § 3501(b).  However, the presence or absence of any of these factors is not dispositive of the voluntariness inquiry. See id.; United States v. Restrepo, 994 F.2d 173, 184 (5th Cir. 1993).  The ultimate determination of whether a confession was voluntary constitutes a question of law, but we accept the factual conclusions upon which the district court predicates its voluntariness determination unless they are clearly erroneous. See id. at 183.

As the district court concluded, Hall was arraigned on the charge of aggravated kidnapping by a Texas judge before he made his incriminating custodial statements to Floyd and Ford.[19] Further, Hall was advised of his right not to make a statement and his right to have the assistance of counsel on numerous occasions before he gave his statement.  While Hall was not in the presence of an attorney when he actually made his statement, he had at least had an opportunity to consult with an attorney prior to making it.  We acknowledge that Hall may not have been aware of the gravity of the offense of which he was suspected at the time of his statement, given that it is unclear whether he was aware that Lisa Rene's body had been discovered by the time he made his statement.  However, considering that Hall actually

---

[19]  Hall contends that the arraignment before the Texas municipal court judge did not constitute an "arraignment" within the meaning of § 3501(b) because it did not comport with the requirements of Rule 10 of the Federal Rules of Criminal Procedure.  However, Hall has cited no authority for the proposition that a state arraignment must comport with the Federal Rules of Criminal Procedure in order to constitute an arraignment for purposes of the voluntariness calculus contemplated by § 3501(b).

requested the interview at which he made his statement and further chided Floyd and Ford for taking so long to come and talk to him, we have little trouble concluding, as the district court did, that Hall's confession was "the product of [his] free and rational choice." Doucette, 979 F.2d at 1045 (internal quotation marks omitted).

Hall next claims that his confession was involuntary under § 3501(c) because he was not taken before a federal magistrate judge until twenty-eight days after he was taken into custody in Arkansas. Section 3501(c) provides as follows:

> In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

18 U.S.C. § 3501(c). Hall contends that, because he confessed prior to his presentment before a federal magistrate judge and more than six hours after his arrest, § 3501(c) renders his confession presumptively involuntary.

We note as an initial matter that this court has rejected

96

Hall's interpretation of § 3501(c) as rendering involuntary any confession made prior to presentment and more than six hours after arrest. In <u>United States v. Hathorn</u>, 451 F.2d 1337 (5th Cir. 1971), we stated,

> While Section 3501(c) can be construed to mean that the only confessions obtained more than six hours after arrest that can be admitted are those that were elicited during the time necessary for travel to the magistrate, we [conclude] . . . that Congress did not intend to legislate any such arbitrary edict. We believe the correct interpretation to be that Congress established six hours as a minimum period which would pass muster. If, therefore, a longer delay occurs, it merely constitutes another factor to be considered by the trial judge in determining voluntariness.

<u>Id.</u> at 1341; <u>see</u> <u>also</u> <u>United States v. Perez-Bustamante</u>, 963 F.2d 48 (5th Cir. 1992). More to the point, however, is the fact that § 3501(c) is entirely irrelevant to this case.

In <u>United States v. Alvarez-Sanchez</u>, 511 U.S. 350 (1994), the Supreme Court held that, "[a]s long as a person is arrested and held only on state charges by state or local authorities, the provisions of § 3501(c) are not triggered." <u>Id.</u> at 358. In reaching this conclusion, the court reasoned as follows:

> Clearly, the terms of [§ 3501(c)] can apply only when there is some "delay" in presentment. Because "delay" is not defined in the statute, we must construe the term "in accordance with its ordinary or natural meaning." <u>FDIC v. Meyer</u>, 510 U.S. 471, 476 (1994). To delay is "[t]o postpone until a later time" or to "put off an action"; a delay is a "postponement." American Heritage Dictionary 493 (3d ed. 1992). The term presumes an obligation to act. Thus, there can be no "delay" in bringing a person before a federal magistrate until, at a minimum, there is some obligation to bring the person before such a judicial officer in the first place. Plainly, a duty to present a person to a <u>federal</u> magistrate does not arise until the person has been arrested for a federal offense. See Fed. Rule Crim. Proc. 5(a) (requiring initial

97

> appearance before a federal magistrate). Until a person is arrested or detained for a federal crime, there is no duty, obligation, or reason to bring him before a judicial officer "empowered to commit persons charged with offenses against the laws of the United States," and therefore, no "delay" under § 3501(c) can occur.

Id. at 357-58; see also United States v. Romano, 482 F.2d 1183 (5th Cir. 1973) (providing that Federal Rule of Criminal Procedure 5(a)'s requirement that an officer making an arrest "take the arrested person without unnecessary delay before the nearest available federal magistrate . . . applies only to arrests made by or for federal officials and does not apply to arrests made under state law for state offenses" (citations omitted)).

At the time of his confession, Hall was in custody on state charges. He surrendered to Arkansas law-enforcement authorities in response to the Texas warrant, and Arkansas authorities detained him on the basis that probable cause existed to believe that he committed the crime described in that warrant. The Texas municipal court judge arraigned him solely on the state charge. The fact that a federal complaint and warrant had been issued charging Hall with flight from prosecution at the time that he was taken into custody does not change the fact that Hall was in custody solely on state charges. See United States v. Watson, 591 F.2d 1058, 1062 (5th Cir. 1979) (holding that § 3501(c) did not apply until a defendant who was being held in custody by state officials on a state charge of bank robbery was taken into federal custody even though a federal warrant had issued based on

98

the same offense prior to the defendant's arrest by state officials).

Hall argues, however, that federal and state authorities were working in tandem in investigating Hall and that the circumstances surrounding his arrest and detention thus constitute an exception to the general rule that § 3501(c) and Rule 5 of the Federal Rules of Criminal Procedure do not apply to an individual in custody solely on state charges. In <u>Alvarez-Sanchez</u>, the Supreme Court observed that,

> [a]lthough we think proper application of § 3501(c) will be as straightforward in most cases as it is here, the parties identify one presumably rare scenario that might present some potential for confusion; namely, the situation that would arise if state or local authorities, acting in collusion with federal officers, were to arrest and detain someone in order to allow the federal agents to interrogate him in violation of his right to a prompt federal presentment. Long before the enactment of § 3501, we held that a confession obtained during such a period of detention must be suppressed if the defendant could demonstrate the existence of improper collaboration between federal and state or local officers.

<u>Alvarez-Sanchez</u>, 511 U.S. at 359. The record reveals no such improper collaboration in this case. As the district court concluded, "[t]here is little, if any, evidence to suggest that [Hall] was being held by the state solely to permit in-custody interrogation by federal officials without compliance with Rule 5 or § 3501(c)." Indeed, Agent Floyd testified, and the district court found, that, at the time Hall made his custodial statement, Floyd was not even aware of the issuance of a federal warrant or complaint against Hall for flight from prosecution. We see no reason to disturb the district court's factual

99

conclusion that the record in this case reflects the existence of nothing more than "routine cooperation between local and federal authorities," which is "wholly unobjectionable." Alvarez-Sanchez, 511 U.S. at 360. We therefore reject Hall's contention that § 3501(c) rendered his confession inadmissible as substantive evidence against him.

### L. Additional Review Under § 3595(a)

In addition to imposing a duty upon the court of appeals to "address all substantive and procedural issues raised on the appeal of a sentence of death," the FDPA also imposes a duty upon this court to "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of a[] [statutory] aggravating factor." 18 U.S.C. § 3595(c)(1). We have found nothing in the record indicating that the jury's recommendation of a death sentence was motivated in any degree by passion, prejudice, or any other arbitrary factor. Further, as noted in Part II.H.3, supra, in connection with our harmless-error analysis of the district court's submission of the nonstatutory aggravating factor of the effect of the offense on Lisa Rene's family, the record contains ample evidence from which the jury could conclude beyond a reasonable doubt that the death occurred during the commission of a kidnapping, the aggravating factor set forth in § 3952(c)(1), and that Hall killed Lisa Rene in an especially heinous, cruel, or depraved manner, the

100

aggravating factor set forth in § 3592(c)(6).[20]

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment of conviction and sentence.

---

[20]  Hall objects to the order of this court permitting him to file only a 100-page brief.  We have allowed Hall to file a brief containing twice the normally applicable maximum number of pages and conclude that he was not denied due process or the effective assistance of counsel by not allowing him to file an even longer brief.  See FED. R. APP. P. 28(g).  We therefore decline to consider the arguments that Hall asserts in an appendix to his initial brief.  Cf. Conkling v. Turner, 18 F.3d 1285, 1299 n.14 (5th Cir. 1994) ("Attorneys cannot circumvent the fifty-page limit of Federal Rule of Appellate Procedure 28(g) by incorporating by reference a trial memorandum."); Yohey v. Collins, 985 F.2d 222 (5th Cir. 1993) (declining to consider arguments in other pleadings that the appellant attempted to incorporate by reference in a brief already in excess of the 50-page limit).